# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | : | |
| IN RE: PENNSYLVANIA TITLE | : | CIVIL ACTION |
| INSURANCE ANTITRUST LITIGATION | : | |
| | : | NO. 08-01202 |
| | : | |

## Memorandum

YOHN, J.                                                    July 21, 2009

 Plaintiffs, purchasers of title insurance in Pennsylvania, have filed this action alleging

antitrust violations by title insurance companies and their affiliates and the Title Insurance Rating

Bureau of Pennsylvania ("TIRBOP") arising out of a conspiracy to fix rates for title insurance

purchased in Pennsylvania.  This suit began as a series of separate class actions by named

plaintiffs against various defendants.  Pursuant to an order from this court consolidating these

actions, plaintiffs filed a consolidated complaint that raises one claim for violation of § 1 of the

Sherman Act (15 U.S.C. § 1 (2006)).  Presently before the court is defendants' motion to dismiss

the complaint, with prejudice, against all defendants pursuant to Federal Rule of Civil Procedure

12(b)(6) for failure to state a claim upon which relief can be granted.

## I. Facts and Procedural Background

 Plaintiffs allege that defendants participated in anti-competitive conduct via a conspiracy

to engage in the "collective price-setting of [title insurance] rates in the Commonwealth of

Pennsylvania."  (Pls.' Consolidated Compl. ["CC"] ¶ 1.)  The collective setting of title insurance

rates forms the central theme of plaintiffs' complaint.  (CC ¶¶ 1, 5, 6, 37, 39, 50, 54.)  To

establish context for their antitrust allegations, plaintiffs' complaint provides an overview of title

insurance and its regulation in Pennsylvania.  For the purposes of this motion, the court must

accept as true facts pleaded in the complaint.

### A.    Title Insurance and the Title Insurance Industry

Title insurance provides a warranty "against a loss arising from [past] problems that . . .

may affect the title to the real estate that a consumer is buying."  (*Id.* ¶ 2.)  More precisely,

"[t]itle insurance protects the purchaser . . . from any unidentified defects in the title that would

in any way interfere with the full and complete ownership and use of the property," including

resale.  (*Id.* ¶ 38.)  Title insurance also "protects the lender up to the amount of the mortgage . . .

[and protects] a purchaser from loss for hazards and defects in title that already exist at the time

of purchase."  (*Id.*)

"[I]n most residential and commercial real estate transactions," (*id.* ¶ 38), in

Pennsylvania, lenders require purchasers to obtain title insurance (*id.* ¶¶ 38, 40).  In practice,

purchasers exercise little discretion in choosing their title insurer because typically "lawyers,

[mortgage] brokers, . . . lenders[, and title agents] . . . decid[e] which title insurer to use."  (*Id.* ¶

42; *see also id.* ¶ 44.)  Because purchasers do not shop around or negotiate price, the sale of title

insurance occurs outside normal competitive processes.  (*See id.* ¶¶ 42, 44.)

A title insurer "bears [the risk] for any undiscovered defects in title, [which amounts to] a

very limited risk of loss to the insurer . . . because title insurance protects against *prior* events

that cause defects."  (*Id.* ¶ 40.)  A title insurer can "readily identif[y] and exclude[]," (*id.*), these

defects before issuing a policy by conducting a "proper search and examination of prior

ownership records" (*id.*; *see also id.* ¶ 43).  Thus, any remaining risk comes largely from

incomplete searches or erroneous public records.

Because of this unique nature of title insurance, "the title insurance industry operates . . . [in a manner that] fueled defendants' conspiracy." (*Id.* ¶ 43.) An individual purchases "[t]itle insurance . . . primarily through title agents, many of whom" both operate under the ownership or control, or both, of title insurers and provide the searches of public records so vital to the decision "to underwrite a particular property." (*Id.*) Title insurers generate business "most effective[ly] . . . [by] encourag[ing] the real estate middlemen – the lawyers, brokers, lenders, and title agents – to steer business to [them]." (*Id.* ¶ 44.) Title insurers provide this encouragement "through kickbacks in the form of finder's fees, gifts, and other financial enticements." (*Id.*) To pay for these "inducement[s] to steer business their way," title insurers need "to inflate their revenues" beyond the costs "[]related to the issuance of title insurance," i.e. the risk involved in insuring the property against title defects. (*Id.* ¶ 45)

In Pennsylvania, many title insurers set rates "based on a percentage of the total value of the [insured] property." (*Id.* ¶ 37.) "[T]wo principal cost components . . . go into [this] calculation": (1) "the risk associated with issuing the title policy," which, as explained above, records searches can minimize, and (2) "[t]he 'agency commissions' . . . [paid] to title agents." (*Id.* ¶ 41.) Of the agency commissions component, "a small portion . . . [pays] for the search and examination of prior ownership records of the property being purchased to identify . . . defects in the title." (*Id.*) Almost invariably, title insurers "outsource this task to title agents," (*id.*), many of whom, as mentioned above, work for title agencies in which title insurers have an ownership or management stake (*id.*). Consequently, it is "the bulk[] of the agency commissions" component that pays the cost of "kickbacks and other financial inducements title insurers provide to title agents and indirectly (through title agents) to the lawyers, brokers, and lenders who, in

reality, . . . decid[e] which title insurer to use." (*Id.* ¶ 42.)

In other words, perverse incentives underlie title insurance pricing: higher rates increase the revenue for kickbacks, which in turn increases the likelihood of referrals and thus business for title insurers. (*Id.*) As a result, much of the rate collected for title insurance goes, not for the cost of providing insurance, but to inducements. (*Id.* ¶ 45.)

### B.     Title Insurance Regulation in Pennsylvania

"Pennsylvania [law] requires title insurers to file their rates with the [state's] Department of Insurance [("DOI")]," (*id.* ¶ 39), which "supervise[s], examine[s], and regulate[s] title insurers" (*id.* ¶ 4). Title insurers must file their rates with the DOI and can do so individually or through a rating organization, which collectively files rates on title insurers' behalf. (*Id.* ¶ 39); *see also* 40 Pa. Stat. Ann. § 910-37(a)-(b) (West 2009) (permitting ratings organizations to submit rates on behalf of title insurers); *id.* § 910-41 (permitting title insurance companies to form rating organizations).[1] With any rate filing, a title insurer must provide a statement

_____

[1]   Section 910-37 provides in relevant part:

> (a) Every title insurance company shall file with the commissioner every manual of classifications, rules, plans, and schedules of fees and every modification of any of the foregoing relating to the rates which it proposes to use. Every such filing shall state the proposed effective date thereof, and shall indicate the character and extent of the coverage contemplated.

> (b) A title insurance company may satisfy its obligations to make such filings by becoming a member of, or a subscriber to, a licensed rating organization which makes such filings, and by authorizing the commissioner to accept such filings on its behalf.

40 Pa. Stat. Ann. § 910-37(a)-(b).

Section 910-41 provides in relevant part that:

-4-

concerning the basis for establishing the rate. *Id.* § 910-38. The insurer or rating organization

making the filing can base the rate on its own judgment or experience, the experience of any

other insurer or ratings agency, or any other factor that the filer deems relevant. *Id.*

Once rates are filed, the DOI "shall make such review of the filings as may be necessary

to carry out the provisions of" the statutes governing title insurance. *Id.* § 910-37(c). The

standards for title insurance rates require that they "shall . . . not be excessive." *Id.* § 910-39(b).

Consequently, the rates shall permit a title insurer to earn a "reasonable profit," after paying all

taxes and accounting for expenses and losses arising out of the normal course of business. *Id.*

Typically, any rate filed becomes effective upon agency approval or within thirty days of filing,

with or without agency review. *Id.* § 910-37(d). Any rate that becomes effective shall be

"deemed to meet [these above] requirements." *Id.* § 910-37(e). An individual title insurer *must*

charge title insurance rates in accordance with those rates filed and approved by the DOI. *Id.* §

910-37(h) (emphasis added).

Despite the regulatory framework for authorizing title insurance rates, the DOI has

"limited resources . . . to regulate title insurance rates," according to plaintiffs. (CC ¶ 52.) The

"department has no separate administrative title insurance section." (*Id.*) It has "no certified

public accountant assigned to systematically and effectively review the information provided by

[rate filers]." (*Id.*) Nor can the DOI "demand additional information in support of . . . filed

rates." (*Id.*) DOI "personnel . . . largely . . . monitor[] and regulat[e] the major insurance

---

     (a) A corporation, an unincorporated association, a partnership or an
     individual, whether located within or outside this Commonwealth,
     may make application to the commissioner for license as a rating
     organization for title insurance companies.

40 Pa. Stat. Ann. § 910-41(a).

products such as health, life, auto, and fire and casualty insurance rates." (*Id.*)   Thus, the DOI "does not subject [filed rates] to any accounting analysis designed to determine whether . . . [they] conform to the regulatory requirements that they be reasonable, not excessive[,] and non-discriminatory." (*Id.* ¶ 53.)

### C.   Parties and Alleged Conduct

The named plaintiffs[2] are all Pennsylvania residents who purchased title insurance directly from one of the defendants and, allegedly, have been injured as a result of antitrust violations arising out of defendants' conspiracy.   They bring this class action on behalf of "all persons . . . who, from . . . March 11, 2004 to the present, purchased directly, from one or more of the defendants and/or their co-conspirators, title insurance for residential and/or commercial property in the Commonwealth of Pennsylvania." (*Id.* ¶ 27.)   Plaintiffs list defendants as five groups of title insurance companies and their affiliates, with each group "wholly-owned and/or controlled by" one parent entity.[3] (*Id.* at ¶ 12; *see also id.* at ¶¶ 14, 16, 18, 20.)

---

[2]   Barbara B. Holt; Kristi Cleveland; Phyllis Weinstock; Thomas C. Wee and Kaca Wee; Kimberly Druker; Shawn Shapiro; Marc Waterman; Marchwood Realty Co., LP; Ralph and Gail Bianco; Steven Hilkowitz; Daniel Coady; Mark Colacicco; Fredrick Duling; and Peter Jacobson.

[3]   These groups include:

1.   The Fidelity family of title insurance companies, which includes these defendants: Fidelity National Title Insurance Company, Chicago Title Insurance Company, Ticor Title Insurance Company, and Ticor Title Insurance Company of Florida, all of whom are wholly-owned or controlled by defendant Fidelity National Financial, Inc., a Delaware corporation headquartered in Florida.

2.   The First American family of title insurance companies, which includes these defendants: First American Title Insurance Company, Censtar Title Insurance Company, United General Title Insurance Company, and T.A. Title Insurance Company, all of whom are wholly-owned and controlled by defendant First American Corporation, a California corporation headquartered in California.

Some "[c]lass members from locations outside . . . Pennsylvania purchased . . . property and title insurance within Pennsylvania." (*Id.* ¶ 34.) "Defendants controlled . . . more than 97 percent of the market for title insurance in . . . Pennsylvania." (*Id.* ¶ 35.) "During the period in suit, the defendants and their co-conspirators sold substantial quantities of title insurance in a continuous and uninterrupted flow in interstate commerce." (*Id.* ¶ 33.) The alleged collusive activity surrounding defendants' sale of title insurance likewise occurred "within the flow of interstate commerce and substantially affected interstate commerce." (*Id.* ¶ 36.)

Defendant TIRBOP provides the lynchpin for plaintiffs' theory that defendants engaged in a conspiracy in violation of antitrust laws. "TIRBOP is a voluntary association of title insurers licensed by the [DOI]." (*Id.* ¶ 21.) TIRBOP includes all defendant title insurance companies, who are some of "the largest insurance companies in the nation," (*id.* ¶ 5), and together comprise sixteen of TIRBOP's twenty-six members (*id.* ¶ 24). TIRBOP "prepares and submits [to the

---

3.     The LandAmerica family of title insurance companies, which includes these defendants: Commonwealth Land Title Insurance Company, Commonwealth Land Title Insurance Company of New Jersey, Lawyers Title Insurance Corporation, and Transnation Title Insurance Company, all of whom are wholly-owned and controlled by defendant LandAmerica Financial Group, a Virginia corporation headquartered in Virginia.

4.     The Stewart family of title insurance companies, which includes these defendants: Stewart Title Guaranty Company and National Land Title Insurance Company, all of whom are wholly-owned and controlled by defendant Stewart Information Services Corporation, a Delaware corporation headquartered in Texas.

5.     The Old Republic family of title insurance companies, which includes these defendants: Old Republic National Title Insurance Company and American Guaranty Title Insurance Company, all of whom are wholly-owned or controlled by defendant Old Republic International Corporation, a Delaware corporation headquartered in Illinois.

(CC ¶¶ 11-20.)

DOI] a manual which sets forth title [insurance] rates," (*id.* ¶ 23), that TIRBOP's members collectively agreed to charge, along with aggregated "statistical data relating to their title insurance premiums, losses[,] and expenses" (*id.* ¶¶ 23, 39).  In its submissions, TIRBOP presents "a single rate that comprises both the premium for the title insurance, the cost of the search, [and other administrative costs], and the kickbacks, financial inducements[,] and other funds channeled to the title agents."  (*Id.* ¶ 49.)  "Through TIRBOP, defendants have been able to collectively fix title insurance rates at supra-competitive levels."  (*Id.* ¶ 39.)

> **D.      Plaintiffs' Claim and Procedural History**

Putting all the above pieces together, the thrust of plaintiffs' claim of collective price setting takes full form and scope.  For title insurers to obtain and maintain business, they depend on referrals from lawyers, brokers, lenders, and title agents.  To secure referrals, title insurers need to offer kickbacks and other financial inducements to those who make referrals.  Because of the need for sufficient revenue to pay for kickbacks and other financial inducements, title insurers have a perverse incentive to charge high, not low, rates for title insurance, well-beyond the risk, and other associated costs, of title insurance.  To ensure that high rates do not leave some title insurers at a competitive disadvantage, title insurers need to set collectively agreed rates.  To set collectively agreed rates, title insurers need to submit rates through a ratings bureau, specifically TIRBOP.

In filing its rates, TIRBOP cites only "the value of the property being insured" as the basis of its rates, even though in actuality the rates submitted "are entirely unrelated to the value of the property."  (*Id.* ¶ 46.)  Consequently, TIRBOP does not inform the DOI, and the DOI does not know, the extent to which the need to fund kickbacks and inducements affects the rates

TIRBOP submits.  (*Id.* ¶¶ 49-50.)  Moreover, the DOI does not have the capacity to review effectively the rates submitted by TIRBOP.  (*Id.* ¶ 52.)  In this way, defendants' conspiracy is meant "to effectively 'hide' the cost basis for their artificially high and collectively fixed title insurance premiums from . . . regulatory scrutiny."  (*Id.* ¶ 50.)  Without a competitive market that encourages low prices for title insurance or a regulatory agency equipped to review submitted rates, defendants have broad reign to fix title insurance rates collectively at supra-competitive levels to the detriment of property purchasers.  (*Id.* ¶ 54.)

For the reasons explained above, plaintiffs allege that defendants have engaged in a conspiracy "to collectively fix title insurance rates," (*id.*), and "to increase the prices Pennsylvania title insurance purchaser have paid compared to what they would have paid absent defendants' joint illegal conduct," (*id.* ¶ 7).  Plaintiffs' claim arises out of the antitrust violations inherent in this conspiracy.  Defendants created and executed "a horizontal agreement to fix the form, structure, and prices of title insurance in Pennsylvania[,] . . . a per se violation of § 1."[4] (*Id.* ¶ 59.)  As a result of this "collective price fixing and manipulation of the regulatory process," (*id.* ¶ 61), plaintiffs suffered these injuries: "(a) price competition in the sale of title insurance has been suppressed, restrained[,] and eliminated; (b) prices for title insurance have been raised, fixed, maintained, and stabilized at artificially high and non-competitive levels; and (c) purchasers of title insurance have been deprived the benefit of free and open competition," (*id.* ¶ 62).  Plaintiffs' alleged damages consist of the amount "paid more for [title insurance] than

---

[4] At oral argument plaintiffs clarified that they predicated their price-fixing case on defendants' conspiracy to submit to the DOI one uniform rate, 80% of which was attributed to commissions for the title insurance agents, which in turn included the cost of the alleged kickbacks and other financial inducements.

would have been paid in absence of [the alleged] antitrust violations." (*Id.* ¶ 63.)

This suit began as a series of class actions, each of which made similar allegations to those here and were against some of the same defendants. On August 20, 2008, the court ordered the consolidation of these suits, and the above plaintiffs then filed this consolidated class action complaint. Subsequently, the defendants jointly moved to dismiss the consolidated complaint for failure to state a claim pursuant to rule 12(b)(6).[5] Plaintiffs responded jointly and defendants replied. The court held oral argument on the motion on May 12, 2009.

**II.    Discussion**

Defendants argue that the court should dismiss plaintiffs' complaint with prejudice for failure to state a legally cognizable claim because the filed rate doctrine ("the doctrine") bars antitrust actions, such as plaintiffs', that challenge any rate properly filed with, and approved by, a regulatory agency. Defendants also argue that the court should dismiss the complaint against the corporate parents of any subsidiary that allegedly participated the conspiracy because parents have no liability for the conduct of their subsidiaries.

Plaintiffs argue that the filed rate doctrine does not bar their claim because the complaint neither alleges circumstances that warrant the doctrine's application, nor implicates the doctrine's underlying policies. Plaintiffs further argue that the filed rate doctrine can not bar their claim for injunctive relief. Plaintiffs also argue that all corporate parent defendants "approved of" and "assented to" the alleged conspiracy and are thus liable.

**A.    Standard of Review**

_____

[5] On December 5, 2008, the court stayed the action against defendant LandAmerica Financial Group, Inc. following its voluntary filing for Chapter 11 bankruptcy.

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint. *Johnsrud v. Carter*, 620 F.2d 29, 33 (3d Cir. 1980) (citation omitted). When evaluating a motion to dismiss, the court must accept as true all well-pleaded allegations of fact in the plaintiff's complaint, and any reasonable inferences that may be drawn therefrom must be viewed in the light most favorable to the plaintiff. *See Phillips v. County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008); *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir. 1996). "[U]nder Rule 12(b)(6) the defendant has the burden of showing no claim has been stated." *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991).

The complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This statement must "'give a defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *see also Phillips*, 515 F.3d at 234 (reasoning that the notice pleading standard encompasses the concept of a "showing," which "requires only notice of a claim and its grounds"). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations and alterations omitted). Furthermore, "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (citations omitted); *see also Phillips*, 515 F.3d at 234-35.

**B.    Antitrust Actions and Filed Rate Doctrine**

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1 (2006). Under the Sherman Act, "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States" to recover treble damages arising from the injury. *Id.* § 15.

The filed rate doctrine "bars antitrust suits based on rates that have been filed and approved by federal agencies." *Utilimax.com, Inc. v. PPL Energy Plus, LLC*, 378 F.3d 303, 306 (3d Cir. 2004). The doctrine originated in *Keogh v. Chicago and North West Railway Company*, where the Supreme Court held that a private shipper may not bring a cause of action against an association of freight carriers that collectively agreed on shipping rates and had them filed with, and approved by, the Interstate Commerce Commission ("ICC"), as required by the Interstate Commerce Act ("ICA"). 260 U.S. 156, 161 (1922). The Court reasoned that when the ICC approved the rate, the rate became legal and a legal rate can not cause an antitrust injury. *Id.* at 162-63. Furthermore, the Court reasoned that were it to grant relief based on an antitrust violation, it would undermine the authority of the ICC and engage in speculation about what a proper rate should be, a task for which courts are ill-suited. *Id.* at 163-64. Additionally, adjudication would grant the plaintiff a rebate, in the form of damages, that other consumers would not receive in violation of the ICA's goal of uniform rates.[6] *Id.* at 163. In applying *Keogh*, courts have expanded the doctrine's scope to preclude antitrust actions that challenge

---

[6] The ICA prohibits discriminatory pricing in shipping rates to prevent carriers from giving some customers discounts to the competitive disadvantage of other, disfavored customers. *See Keogh*, 260 U.S. at 163 (explaining the "paramount purpose of Congress" in enacting regulation of rates: "prevention of unjust discrimination").

rates filed with state agencies.  *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 20 (2d Cir. 1994)

("[T]he rationales underlying the filed rate doctrine apply equally strongly to regulation by state

agencies.").

Although the Court has recognized developments that undermine the reasoning of *Keogh*,

the Court has left to Congress the decision to overrule the filed rate doctrine and Congress has

yet to do so.  *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 421-24

(1986).  Even courts that have questioned the filed rate doctrine have adhered to it under the

principle of stare decisis.  *See, e.g.*, *Sec. Servs., Inc. v. K Mart Corp.*, 511 U.S. 431, 440 (1994)

(emphasizing that filed rate doctrine "not subject to discretionary enforcement," even though

"some may debate in other forums about [its] wisdom"); *Goldwasser v. Ameritech Corp.*, 222

F.3d 390, 402 (7th Cir. 2000) (noting that although filed rate "doctrine ha[s] come under some

criticism[,] . . . we are bound to follow it"); *Utilimax.com, Inc. v. PPL Energy Plus, LLC*, 273 F.

Supp. 2d 573, 580 (E.D. Pa. 2003) (calling filed rate doctrine "vigorously criticized," but

observing that "the Supreme Court has declined an invitation to overturn" it), *aff'd*, 378 F.3d

303.

In applying the filed rate doctrine, a part of federal common law, the court can fill in the

interstices of the doctrine by drawing on state law.  *See Kamen v. Kemper Fin. Servs., Inc.*, 500

U.S. 90, 97-98 (1991) (finding that court can fill in contours of federal statute with federal

common law, but in doing so should incorporate state law where parties expect state law

standards to apply).  Here, because this case involves the doctrine's application to a Pennsylvania

regulatory agency, the DOI, which both parties agree operates under Pennsylvania law, the court

finds especially relevant the treatment of the filed rate doctrine in Pennsylvania.[7]  Recently, the

Pennsylvania Supreme Court held that because a "[c]omplaint does not allege a rate injury

claim[,] . . . the filed rate doctrine" does not provide grounds for dismissal.  *Ciamaichelo v.*

*Indep. Blue Cross*, 909 A.2d 1211, 1218 (Pa. 2006).  In so ruling, the court implied that where a

complaint does allege a rate injury, the filed rate doctrine would apply.  In short, under

Pennsylvania law, the filed rate doctrine applies with full force to antitrust actions that allege a

rate injury, regardless of the doctrine's limited applicability outside the anti-trust context.[8]

       Thus, despite the above intimations on the doctrine's limited validity and scope, the filed

rate doctrine remains well-established law.  Indeed, courts have applied the doctrine to antitrust

actions involving all different types of regulated rates, including title insurance.  *See, e.g.*,

*Charles v. Lawyers Title Ins. Co.*, Civil Action No. 06-2361 (JAG), 2007 WL 1959253, at *5-*6

(D.N.J. July 3, 2007).  Based on the foregoing, if the filed rate doctrine applies to title insurance

rates submitted by defendant TIRBOP, plaintiffs can not recover antitrust damages and the court

---

       [7]  Plaintiffs argue that state, not federal, law governs the application of the filed rate
doctrine, but in support plaintiffs cite to cases where the filed rate doctrine threatened to preclude
a cause of action grounded solely in state law.  (Pls.' Mem. Law Opp'n Defs.' Joint Mot. to
Dismiss Consolidated Compl. 6-7.)  Here, because federal antitrust law, and not state law,
provides the basis of plaintiffs' complaint, plaintiffs' cited cases do not control.  *See, e.g.*,
*Blaylock v. First Am. Title Ins. Co.*, 504 F. Supp. 2d 1091, 1102-03 (W.D. Wash. 2007) (looking
to state precedent to determine applicability of filed rate doctrine to cause of action arising under
*state* law).

       [8]  In *Old Forge School District v. Highmark, Inc.*, the Pennsylvania Supreme Court held
that a party could properly bring a breach of contract and unjust enrichment suit arising out of
insurance rates because *Ciamaichelo*'s holding undermined presumption that "challenges to rates
and reserves are entirely within the sound discretion of the [relevant agency] and are not the
proper subject of adversary litigation."  924 A.2d 1205, 1213 (Pa. 2007).  Because these plaintiffs
sought relief under breach of contract and unjust enrichment theories, this decision does not
diminish the applicability of the filed rate doctrine to *antitrust* claims based on rates filed with a
state agency.

-14-

must grant defendants' motion.  The parties dispute four issues that affect the applicability of the filed rate doctrine: (1) whether the DOI had to, and did in fact, provide meaningful review of TIRBOP's submitted rates, (2) whether defendants submitted properly filed rates, (3)  whether defendants' alleged conduct constituted non-rate anti-competitive behavior, and (4) whether defendants' alleged conduct implicates the policy concerns underlying the filed rate doctrine.

### 1.    Meaningful review requirement

Plaintiffs argue that the filed rate doctrine applies only where an agency gives filed rates meaningful review, which the DOI lacks the capacity to do for TIRBOP's submitted rates. Defendants maintain that application of the filed rate doctrine does not depend on any meaningful review from the regulating agency.  Indeed, the Supreme Court rejected a requirement for the filed rate doctrine that predicated its application on an agency's exercise of "meaningful review" of filed rates.  *See Square D*, 476 US. at 417 n.19.

In *Square D*, petitioners opposed application of the filed rate doctrine because, unlike in *Keogh*, "there was no ICC hearing in this case" and thus *Keogh* and the filed rate doctrine did not control.  *Id.*  The Court noted that "[t]he Court of Appeals . . . properly concluded that *Keogh* was not susceptible to such a narrow reading."  *Id.*  The Court went on to quote, with approval, the language from the Court of Appeals:

> "Rather than limiting its holding to cases where, as in Keogh, rates had been investigated and approved by the ICC, the Court said broadly that shippers could not recover treble-damages for overcharges *whenever tariffs have been filed*."

*Id.* (quoting *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 760 F.2d 1347, 1351 (2d Cir. 1985)) (emphasis added).  In commenting approvingly on the decision of Court of Appeals, the

Supreme Court rejected the argument that agency investigation and approval of the rates filed is a prerequisite to application of the filed rate doctrine.  *Id.*

Other courts have followed the Court's decision in *Square D* that the filed rate doctrine applies regardless of the level of agency review.  The Seventh Circuit read *Square D* as rejecting the idea that the filed rate doctrine does not apply simply because a reviewing agency "rarely exercise[s] [its] muscle and thus give[s] no meaningful review to the rate structure." *Goldwasser*, 222 F.3d at 402.  The First Circuit went even further and explained that the "*filing* of the tariffs, and not any affirmative approval or scrutiny by the agency, . . . triggers the filed rate doctrine."  *Town of Norwood, Mass. v. New England Power Co.*, 202 F.3d 408, 420 (1st Cir. 2000) (emphasis in original).  Drawing on *Square D*, one district court held that the filed rate doctrine applies "regardless of the extent of the regulatory agency's inquiry into the appropriateness of those rates."  *Daleure v. Kentucky*, 119 F. Supp. 2d 683, 689 (W.D. Ky. 2000) (noting that *Square D* considered lack of formal agency hearing on rate irrelevant to application of filed rate doctrine), *appeal dismissed*, 269 F.3d 540 (6th Cir. 2001).  Another district court found no "legitimate reasons why . . . the 'filed-rate' doctrine should give way here to a borrowed principle of 'no meaningful review'" with respect to rates submitted to a federal agency.  *Kline & Co. v. MCI Commc'ns Corp.*, 98 F. Supp. 2d 69, 73 (D. Mass. 2000).

Nevertheless, for a court to consider rates filed, and thus protected by the filed rate doctrine, the statutory scheme must provide the regulatory agency with authority to assess rates' compliance with statutory requirements for filed rates.  *Tex. Commercial Energy v. TXU Energy, Inc.*, 413 F.3d 503, 510 (5th Cir. 2005) (finding filed rate doctrine applicable because statutory scheme provides agency "oversight . . . sufficient to conclude that . . . rates are 'filed' within the

-16-

meaning of the filed rate doctrine"), *cert. denied*, 546 U.S. 1091 (2006); *Town of Norwood*, 202 F.3d at 419 (explaining that application of filed rate doctrine triggered by filing of rates, but that filing requirement ensures agency review of rates for compliance with rate standards).  Based on the above, the court concludes that as long as the regulatory scheme requires the filing of rates with a government agency that has legal authority to review those rates, the filed rate doctrine applies regardless of the actual degree of agency review of those filed rates.  *See McCray v. Fidelity Nat'l Title Ins. Co.*, No. 08-075, slip. op. at 13 (D. Del. July 15, 2009) (expressing belief that Third Circuit would not limit application of filed rate doctrine to "only those regulatory regimes that expressly approve rates").

In this case, because of the authority cited above and Pennsylvania's statutory scheme governing title insurance rates, the filed rate doctrine applies irrespective of the degree of agency inquiry, scrutiny, or exercise of regulatory muscle.  Under this statutory scheme, thirty days after the title insurer files a rate, in general the rate becomes effective automatically, 40 Pa. Stat. Ann. § 910-37(d), unless the DOI has already rejected the rate as further described below.  This automatic approval, however, does not mean the statutory scheme does not provide for agency review.  First, the DOI has the authority to make a rate effective, or reject it following a hearing, during the thirty-day period.  *Id.*  In fact, however, at oral argument, plaintiffs conceded that the DOI had affirmatively approved the rates in question.  More importantly, regardless of the method of approval, the DOI "*shall* make such review of the filings as may be necessary to carry out the provisions of" the statutes governing title insurance.  *Id.* § 910-37(c) (emphasis added); *see also id.* § 910-39(b) (requiring that rates "shall . . . not be excessive" and provide insurers with a "reasonable profit").  The DOI may conduct this review at any time and, as long as the

DOI provides a hearing, it can even disapprove of a rate submitted at any time, including after the post-filing review period.  *Id.* § 910-40(a).  Because the statutory scheme provides the DOI with authority to review submitted rates, and because in this circuit the filed rate doctrine has no meaningful review requirement as to the degree of agency review exercised, the filed rate doctrine applies.  *But see McCray*, slip. op. at 14 (applying filed rate doctrine because regulatory agency had legal *and* factual competence "to [provide] meaningful and competent review of rate filings to determine [compliance] with the statutory principles").

Even so, plaintiffs argue that due to the DOI's technical and administrative impotence, it provides insufficient meaningful agency review to warrant application of the filed rate doctrine.  Plaintiffs allege, and the court must accept as true for the purposes of this motion, that the DOI lacks the resources to exercise its authority and thus to review filed rates adequately.  (CC ¶¶ 52-54).  In particular, the DOI does not have the investigative personnel to determine whether defendants set high premiums to raise revenue to pay for kickbacks and inducements and whether defendants complied with regulations governing the substantive and procedural requirements for filing title insurance rates.

Despite these allegations, plaintiffs' argument relies on authority not applicable to this matter as set forth in plaintiffs' complaint.  For support for their contention that the filed rate doctrine has a meaningful review requirement, plaintiffs turn to *Wileman Brothers and Elliot Inc. v. Giannini*, a Ninth Circuit case where industry participants submitted fruit cultivation standards that were subject to agency disapproval.  909 F.2d 332, 337 (9th Cir. 1990).  The court found the filed rate doctrine inapplicable because the agency's review amounted to "mere . . . failure to disapprove[, which] does not legitimize otherwise anticompetitive conduct" and any resulting

-18-

rate. *Id* at 337-38.  Not only does this court have no obligation to follow a decision from another circuit, but the court also has good reason not to do so in this case.  Here plaintiffs' complaint concerns the limited resources, and thus capacity, the DOI has for reviewing submitted rates, not whether any review existed at all.  In fact, plaintiffs conceded that some review existed in that the DOI affirmatively approved the rates at issue.  As plaintiffs' complaint concerns the degree of agency review, this case bears little significant resemblance to *Wileman* where the court found that only the total lack of agency review of submitted rates made the filed rate doctrine inapplicable.[9]  Additionally, plaintiffs allege that defendants' deceptive conduct "made it impossible for the [DOI] to review, regulate[,] or supervise" submitted rates for compliance with title insurance standards.  (CC ¶ 6; *see also id.* ¶¶ 49-50.)  By contrast, in *Wileman*, no deceptive conduct surrounding rate submissions had any bearing on agency review or the court's decision not to apply the filed rate doctrine.  Even if this court were bound by *Wileman*, it does not support plaintiffs' argument.

In addition, courts bound to apply *Wileman*'s meaningful review requirement have done so only with respect to the review afforded by the statutory and regulatory scheme underlying agency review, not the agency's *capacity* to exercise this statutory authority.  In *Brown v. Ticor Title Ins. Co.*, the Ninth Circuit relied on *Wileman* to hold that rates created from "unlawful activity prior to their being filed," 982 F.2d 386, 394 (9th Cir. 1992), do not have immunity from challenge in the "absence of meaningful state review," *id.*  The court concluded that "the act of

---

[9]  In fact, the *Wileman* court went so far as to suggest that, although it could not consider it on a motion to dismiss, evidence of some agency review of the rates would suffice to apply the filed rate doctrine.  *See Wileman*, 909 F.2d at 338 ("Defendants' evidence of participation by representatives of the Secretary cannot be considered on a motion to dismiss.  The bare fact of non-disapproval, then, . . . is all that is before the court . . .").

filing does not legitimize a rate arrived at by improper action [where state] regulations . . . require only 'non-disapproval' of the rates and do not require compliance with strict guidelines such as those set forth under the ICC regulations." *Id.* In other words, *Brown* had nothing to do with the degree and capacity of agency review of rates, but rather whether rates had to comply with strict statutory guidelines and whether the agency had the legal authority to determine filed rates' compliance with those guidelines. Conversely, plaintiffs' complaint involves only the extent of an agency's factual capacity to conduct review of filed rates and not the agency's legal authority to conduct review. Unlike the agency in *Brown*, the DOI in approving rates must apply strict statutory guidelines for title insurance rates that require, among other things, that they "shall . . . not be excessive" and shall provide title insurers a "reasonable profit." Consequently, even if *Brown*, an opinion from another circuit, were to apply, it would not support plaintiffs' argument.

Where other courts have applied the meaningful review requirement, they have done so with respect to the lack of legal authority for review provided in the statutory and regulatory scheme, not the factual capacity for, or degree of, the agency's exercise of its review power. *See, e.g.*, *Rios v. State Farm Fire & Cas. Co.*, 469 F. Supp. 2d 727, 736-37 (S.D. Iowa 2007) (holding filed rate doctrine applicable because statutory scheme gave agency power to provide "meaningful review of rate increases"); *Hanson v. Acceleration Life Ins. Co.*, No. CIV A3-97-152, 1999 WL 33283345, at *4 (D.N.D. Mar. 16, 1999) (finding filed rate doctrine inapplicable to state law claim because statutory scheme, not agency's exercise of review authority, provided "no mechanism for meaningful review of rates filed"). Because plaintiffs' complaint concerns the DOI's factual capacity for, and actual degree of, review, no meaningful review requirement applies to preclude application of the filed rate doctrine.

In conclusion, the absence of meaningful DOI review of filed title insurance rates, as alleged by plaintiffs, does not render the filed rate doctrine inapplicable.  Were the court writing on a clean slate, the court might decide otherwise, but no direct authority requires that, for the filed rate doctrine to apply, the agency must exercise a particular level of review of filed rates. Considerable authority, including the Supreme Court, has rejected any meaningful review requirement and strongly suggested or held that the mere filing of a rate invokes application of the filed rate doctrine, making meaningful review an unnecessary requirement.  Other authority holds that, at most, the statutory scheme must afford the agency the legal authority to review filed rates for compliance with statutory standards for the filed rate doctrine to apply.  Here, Pennsylvania law governing title insurance provides for this type of review.  The extent to which the agency exercises this review remains properly at the agency's discretion, upon which this court will not intrude.  Consequently, plaintiffs' argument that the DOI lacks the capacity for meaningful review fails as a matter of law.  On this basis, plaintiffs' complaint can not escape application of the filed rate doctrine to preclude plaintiffs' suit for damages.[10]

---

[10]  In finding no meaningful review requirement for application of the filed rate doctrine, the court recognizes the appearance of a conflict with the state action doctrine.  Under the state action doctrine, private entities participating in state-administered price regulation can have immunity from antitrust laws. *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980); *see also Parker v. Brown*, 317 U.S. 341, 352 (1943) (holding state regulatory programs immune from antitrust laws).  This immunity applies if: (1) state policy clearly articulates and affirmatively expresses the price regulation and (2) the state actively supervises the implementation of the price regulation, *Midcal*, 445 U.S. at 105, as opposed to merely giving "deference to private pricefixing arrangements," *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 633 (1992).  For prices, such as title insurance rates in Pennsylvania, "set as an initial matter by private parties, subject only to a [discretionary state] veto, . . . immunity [attaches only if] state officials have undertaken the necessary steps to determine the specifics of the price-fixing or ratesetting scheme."  *FTC*, 504 U.S. at 638.  "The mere potential for state supervision" does not suffice.  *Id.*

Here, the filed rate doctrine precludes defendants' liability for damages from antitrust

2.        **Rate not properly filed**

Plaintiffs argue that the filed rate doctrine only precludes antitrust recovery for properly

filed rates, not rates, such as defendants', that fail the regulatory agency's standards for proper

submission.  Defendants respond that in claiming that the rate submissions were deceptive and

thus improper, plaintiffs essentially rely on a fraud exception to the filed rate doctrine that courts

have consistently refused to create.  Plaintiffs respond that they seek no fraud exception.

The filed rate doctrine applies to rates "*properly filed* with the appropriate federal

regulatory authority." *Ark. La. Gas Co. v. Hall* ["*Arkla*"], 453 U.S. 571, 577 (1981) (emphasis

added).  In fact, "the [Supreme] Court has emphasized the limited scope of the filed rate doctrine

to preclude damage claims only where there are validly filed rates." *Fla. Mun. Power Agency v.*

*Fla. Power & Light Co.*, 64 F.3d 614, 616 (11th Cir. 1995) (citing, inter alia, *K Mart Corp.*, 511

U.S. at 440); *see also Brizendine v. Sandmeyer Steel Co.*, Civ. A. No. 92-0772, 1992 WL

---

violations because the statutory scheme requires title insurers to file rates and provides authority
for review by the DOI, irrespective of the actual level of DOI review.  Arguably then, the filed
rate doctrine applies based on the mere potential for state supervision, even though under the
state action doctrine the Court rejected "potential supervision" as a ground to preclude antitrust
liability.  *FTC*, 504 U.S. at 638.  Thus, as one commentator has observed, the lack of a
meaningful review requirement "seem[s] to stretch the [filed rate] doctrine so far as to make it
snap, since the effect is to completely circumvent the 'active state supervision' requirement for
State Action immunity."  Holmes, *supra*, § 8:6.  Despite this observation, there exists no
apparent requirement of alignment between the preclusive effect of the filed rate doctrine and the
state action doctrine, as courts have treated the two doctrines as independent bases for antitrust
immunity.  *See Trigen Okla. City Energy Corp. v. Okla. Gas & Elec. Co.*, 244 F.3d 1220, 1224
-1225 (10th Cir. 2001) (dismissing action under state action doctrine and as a result declining to
reach filed rate doctrine); *City of Kirkwood v. Union Elec. Co.*, 671 F.2d 1173, 1182 (8th Cir.
1982) (treating filed rate doctrine and state action doctrine as independent grounds for court's
grant of antitrust immunity); *Green v. Peoples Energy Corp.*, No. 02 C 4117, 2003 WL 1712566,
at *4, *8 (N.D. Ill. Mar. 28, 2003) (holding "filed rate doctrine bars plaintiffs' [antitrust] claims"
and holding "state action doctrine also independently bars plaintiffs' claims under the federal
antitrust laws")

129472, at *2 (E.D. Pa. June 8, 1992) (noting that application of filed rate doctrine depends on whether rates properly filed).  Under this proper filing requirement, obtaining enforcement of a "filed" rate requires compliance with agency regulations for effective filing.  *Atlantis Express, Inc. v. Associated Wholesale Grocers, Inc.*, 989 F.2d 281, 284 (8th Cir. 1993).  Consequently, a rate does not become effective "merely because [an agency] accepts and publishes [the] rate." *Atlantis Express, Inc.*, 989 F.2d at 283; *accord In re Olympia Holding Corp.*, 88 F.3d 952, 961 (11th Cir. 1996) ("[A] tariff is not valid, or 'effective,' merely because it is on file with [an agency]." (citing *K Mart Corp.*, 511 U.S. at 437-38)).

In *Security Services, Inc. v. K Mart Corporation*, the Court delineated the scope of the properly filed requirement.  511 U.S. at 440.  The court held that a shipper could not rely on the filed rate doctrine to charge the filed rates, instead of lower negotiated rates, because in actuality the shipper "had no rates on file because its tariff lacked an essential element,"[11] making the rates improperly filed.  *Id.*  Based on the *K Mart* Court's analysis, other courts have found that the doctrine does not apply where improperly filed rates: (1) make it impossible for a purchaser to calculate the rate to be charged, *see In re Olympia Holding Corp.*, 88 F.3d at 961-62 (holding that only "absence of a calculable rate" justifies invalidating improperly filed rate); or (2) are void per se under a statutory or regulatory scheme, *Norwest Transp., Inc. v. Horn's Poultry, Inc.*, 37 F.3d 1237, 1239 (7th Cir. 1994) (finding *K Mart* inapplicable because regulatory scheme had

---

[11]  The shipper did file "specified rates to be charged per mile of carriage," but instead of providing a "list of distances . . . on which a shipper could rely in calculating charges for a given shipment," the shipper referred to a mileage guide composed by a ratings bureau of member shippers.  *K Mart Corp.*, 511 U.S. at 433.  Because the shipper did not renew his membership in the ratings bureau, his rates could not properly refer to the ratings bureau's mileage guides.  *Id.* Without the mileage guides, determining the actual charge for a particular shipment was impossible.  *Id.*

-23-

no provision mandating that "previously filed tariffs [become] void for failure to" comply with regulatory provisions).  *See also Atlantis Express, Inc.*, 989 F.2d at 283 (applying both factors). Notably, these circumstances involve substantive problems in the filed rate; the Supreme Court has long held that technical or formal errors do not invalidate an otherwise properly filed rate that sufficiently notices the rate to be charged.  *Berwind-White Coal Mining Co. v. Chicago & Erie R.R. Co.*, 235 U.S. 371, 375 (1914) (holding filed rates effective because they were "adequate to give notice" of rate charged, although allegedly "not sufficiently formal to comply with the law").

Plaintiffs allege that the filed rate doctrine does not protect defendants' "improper and defective" rate submissions to the DOI.  According to plaintiffs, defendants hid from the DOI that their vastly inflated title insurance rates included of the costs of agency commissions, which are unrelated to the cost of title insurance and go to kickbacks and other inducements.[12]  In submitting rates to the DOI, title insurers must disclose the basis for their rates.  40 Pa. Stat. Ann. § 910-38.  Moreover, "[n]o person or organization shall wilfully withhold information from [the DOI] . . . [that] will affect the rates or fees" for title insurance.  *Id.* § 910-47.  Accepting as true plaintiffs' allegations that defendants distorted the basis of their rates in their submissions to the DOI, defendants did not comply with the above requirements.

Nevertheless, plaintiffs fail to plead that the above non-compliance renders defendants' rates improperly filed and therefore beyond the immunity the filed rate doctrine provides. Plaintiffs do not allege that due to defendants' submitted rates, purchasers of title insurance could

---

[12]  Plaintiffs do not mention an agency's costs for rent or mortgage payments on an office, employees' wages and salaries, title searches, supplies, equipment, advertising, training, taxes, or other routine expenses inherent in operating any business.

not calculate the appropriate title insurance rate.  Furthermore, plaintiffs do not cite a particular

statutory or regulatory provision mandating that a submitted rate becomes void per se for failure

to include every basis for the rate, such as the cost of kickbacks and inducements.  In fact, the

statutory scheme establishes quite the opposite: any rate that the DOI makes "effective shall be

deemed to meet [all other] requirements" for title insurance rates, 40 Pa. Stat. Ann. § 910-37(e),

including requirements that make a rate properly filed.  Therefore, even accepting the truth of

plaintiffs' allegations about the defects in defendants' rate submissions, defendants properly filed

title insurances rates to which the filed rate doctrine applies to preclude plaintiffs' claims.[13]

### 3.     Non-rate anticompetitive activity

Plaintiffs argue that they base their damages claim on defendants' inclusion of the costs

of unlawful inducements in their filed rates in direct violation of Pennsylvania's statutory and

regulatory scheme for title insurance.  According to plaintiffs, the filed rate doctrine "cannot

categorically preclude" this claim because it arises out of conduct separate and apart from the rate

itself.  (Pls.' Mem. Law Opp'n Defs.' Joint Mot. to Dismiss Consolidated Compl. 27 (quoting

*TON Servs., Inc. v. Qwest Corp.*, 493 F.3d 1225, 1237 (10th Cir. 2007).)  Defendants maintain

---

[13] Defendants argue at length that plaintiffs' "improperly filed" argument essentially seeks a fraud exception to the filed rate doctrine based on defendants' failure to disclose the extent to which costs for kickbacks and inducements affected the rate filed.  As defendants correctly point out, "there is no fraud exception to the filed rate doctrine." *AT & T Corp. v. JMC Telecom, LLC*, 470 F.3d 525, 535 (3d Cir. 2006), *cert. denied*, 127 S. Ct. 2913 (2007); *see also Square D*, 476 U.S. at 412-13, 417 (holding that the filed rate doctrine applies even where defendants' filed rate arises essentially out of fraud).  Conversely, the statutory scheme governing title insurance rates prohibits giving fraudulent information that would affect title insurance rates to be made effective by the DOI.  *See* 40 Pa. Stat. Ann. § 910-47.  The court need not resolve this apparent tension between federal common law and Pennsylvania's statutory provisions for title insurance because plaintiffs' improper filing argument fails as explained above and plaintiffs specifically disavowed reliance on the fraud exception.

that plaintiffs' claim is predicated ultimately on the theory that defendants charged too high a rate

for title insurance—exactly what the filed rate doctrine forbids.

The Third Circuit carved out a non-rate anticompetitive activity exception to the filed rate

doctrine's preclusive effect on antitrust actions in *In re Lower Lake Erie Iron Ore Antitrust*

*Litigation*, 998 F.2d 1144, 1159-61 (3d Cir. 1993), *cert. denied*, 510 U.S. 1091 (1994).  Under

this exception, the filed rate doctrine "does not preclude liability based on non-rate

anticompetitive activity."  *Lake Erie*, 998 F.2d at 1159.  In applying the exception, the *Lake Erie*

court found that defendants' alleged conduct—inhibiting low cost competitors from entering the

shipping market[14]—constituted non-rate, anticompetitive activity to which the filed rate doctrine

did not apply.  *Id.* at 1160; *see also Bar Techs., Inc. v. Conemaugh & Black Lick R.R. Co.*, 73 F.

Supp. 2d 512, 518 (W.D. Pa. 1999) (holding filed rate doctrine did not apply where defendant

engaged in conspiracy to block plaintiff's attempts to construct competing rail line).  Although

this conspiracy forced plaintiffs to pay defendants higher shipping rates and thus suffer damages,

the filed doctrine did not apply because "[t]he mere measure of damages, which begins with an

ICC-approved rate, does not define the nature of the conspiracy."  *Lake Erie*, 998 F.2d at 1160.

Conversely, in *Utilimax.com, Inc. v. PPL Energy Plus, LLC*, the Third Circuit held that the non-

rate anticompetitive activity exception did not apply where a defendant "simply positioned itself

in the . . . market to be able to charge exorbitant rates."  378 F.3d at 308 (holding exception

inapplicable where defendant sold excess supply of electricity at agency prescribed rate to retail

suppliers who had statutory obligation to purchase defendants' electricity).

---

[14]  Specifically, defendants conspired to prevent low-cost, non-railroad shippers from
unloading and transporting iron ore from Lake Erie to points inland to the detriment of plaintiffs,
which were steel, dock, and truck companies.  *Lake Erie*, 998 F.2d at 1152-53.

Here, defendants' alleged wrongdoing comes closer to market exploitation, which the *Utilimax* court considered rate-related, than market exclusion, which the *Lake Erie* court considered non-rate activity.  Despite suggestions otherwise in their brief, plaintiffs' complaint alleges that kickbacks and inducements were part and parcel of the overall conspiracy to charge supra-competitive rates, a view plaintiffs confirmed at oral argument.  Thus, plaintiffs challenge the rates themselves that resulted from defendants' alleged need to pay inducements and kickbacks, instead of the inducements and kickbacks as activity allegedly separate from the rates.  Consequently, plaintiffs' claims bear overwhelming resemblance to the impermissible claims in *Keogh* and *Square D* where plaintiffs squarely attacked the filed rates simply because they arose out of alleged conspiracies.

Accordingly, plaintiffs' claim lacks the ancillary connection to a rate-injury that the *Lake Erie* court relied on in developing the non-rate anticompetitive activity exception.  *See Lake Erie*, 998 F.2d at 1160 (noting that plaintiffs' claim had "ancillary" connection to hypothetical higher rate).  Instead, in essence plaintiffs directly challenge the reasonableness or fairness of any particular rate, a circumstance that requires application of the filed rate doctrine.  *See Morales v. Attorneys' Title Ins. Fund, Inc.*, 983 F. Supp. 1418, 1429 (S.D. Fla. 1997) (finding that because plaintiffs' alleged injury ultimately reduces to "'[p]aying 'grossly overpriced title insurance premiums,'" plaintiffs' claims amount to "nothing more than a challenge to . . . rate structure").  In short, the non-rate anticompetitive activity exception does not rescue plaintiffs' complaint from the filed rate doctrine's preclusive effect.  Further support for applying the doctrine comes from the fundamental principles underlying it.

    4.       **Policies underlying the filed rate doctrine: nonjusticiability and**

**nondiscrimination**

The parties also dispute the effect the policies underlying the filed rate doctrine have on its applicability to plaintiffs' claims. "[T]wo companion principles lie at the core of the filed rate doctrine: first, that legislative bodies design agencies for the specific purpose of setting uniform rates, [the nondiscrimination principle,] and second, that courts are not institutionally well suited to engage in retroactive rate setting[, the nonjusticiability principle]." *Wegoland*, 27 F.3d at 19. Thus, the filed rate doctrine: "(1) preserve[s] the regulating agency's authority to determine the reasonableness of rates; and (2) insure[s] that the regulated entities charge only those rates that the agency has approved." *H.J. Inc. v. Nw. Bell Tel. Co.*, 954 F.2d 485, 488 (8th Cir. 1992); *see also Marcus v. AT & T Corp.*, 138 F.3d 46, 58 (2d Cir. 1998) (stating filed rate doctrine "(1) prevent[s] . . . price discrimination . . . and (2) preserv[es] [agencies'] exclusive role . . . in approving rates," a task "agencies are more competent to perform" than courts).

Courts must apply the filed rate doctrine "strictly . . . whenever either the nondiscrimination strand or the nonjusticiability strand underlying the doctrine is implicated by [plaintiffs' proposed] cause of action." *Marcus*, 138 F.3d at 59. Conversely, "[t]he Supreme Court 'has not recently expressed an inclination to extend the filed rate doctrine beyond contexts clearly implicating the anti-discrimination or non-justiciability rationales for the rule.'" *U.S. Wats, Inc. v. AT & T, Co.*, No. CIV. A. 93-1038, 1994 WL 116009, at *5 (E.D. Pa. Apr. 5, 1994) (quoting *Gelb v. AT & T, Co.*, 813 F. Supp. 1022, 1028 (S.D.N.Y. 1993)).

    **a.**    **Nonjusticiability**

Defendants argue that fundamentally plaintiffs' complaint completely defies the nonjusticiability principle by asking the court to determine a reasonable rate and calculate

-28-

damages based on the extent defendants' wrongdoing caused plaintiffs to pay an inflated rate. Plaintiffs contend that their complaint does not implicate the nonjusticiability strand because (1) adjudication of the complaint will not infringe on agency authority as the DOI exercises minimal review of rates and (2) the DOI lacks the ability to provide an adequate remedy for unlawful rates.

The nonjusticiability principle underlies an important purpose of the filed rate doctrine: to prevent courts from engaging in a determination of a reasonable rate absent wrongful conduct. *Wegoland*, 27 F.3d at 21 (citing *Wegoland, Ltd. v. NYNEX Corp.*, 806 F. Supp. 1112, 1116 n.1 (S.D.N.Y. 1992), *aff'd* 27 F.3d 17). Based on this purpose, the doctrine precludes claims for damages where "courts are . . . asked to determine what a reasonable rate would have been," but for the antitrust violations. *Wegoland*, 806 F. Supp. at 1116 n.1; *see also H.J.*, 954 F.2d at 490 (recognizing inapplicability of filed rate doctrine where claim "did not attack the rate itself and did not require the court to 'second-guess' the rate-making agency"). Because of this larger purpose underlying the nonjusticiability principle, a court's "focus for determining whether the filed rate doctrine applies is the impact the court's decision will have on agency procedures and rate determinations." *H.J.*, 954 F.2d at 489.

Plaintiffs' complaint repeatedly alleges that defendants' conduct caused plaintiffs to pay higher title insurance premiums than they otherwise would have "absent defendants' joint illegal conduct."[15] (CC ¶ 7; *see also id.* ¶ 54.) As a result, plaintiffs ask this court for the very relief the filed rate doctrine expressly forbids: a determination of "what a reasonable rate would have

---

[15] In fact, at oral argument, plaintiffs explained that adjudication of this suit would require this court to calculate damages as the difference between the filed title insurance rates and what the rates would have been "but for" defendants' conspiracy to set rates collectively.

been," but for the antitrust violations.  *Wegoland*, 806 F. Supp. at 1116 n.1.  Because plaintiffs' complaint undeniably implicates the nonjusticiability principle, the filed rate doctrine applies to preclude plaintiffs' damages claim.

Furthermore, adjudication of plaintiffs' complaint would have a serious detrimental impact on the DOI's rate determinations.  Plaintiffs repeatedly allege that due to defendants' anticompetitive conspiracy, defendants have filed, and therefore charged, rates for title insurance at supra-competitive levels, well-beyond "reasonable," as required by statute.  Because the alleged antitrust injury in plaintiffs' complaint amounts to nothing more than paying excessive premiums for title insurance, plaintiffs essentially challenge the DOI's rate structure.  *See, e.g.*, *Winn v. Alamo Title Ins. Co.*, Case No. A-09-CA-214-SS, slip op. at 14-15 (W.D. Tex. May 13, 2009) (finding that claim for damages from conspiracy underlying filing of rate constitutes attack on rate itself); *Morales*, 983 F. Supp. at 1429 (calling plaintiffs' alleged injury of "[p]aying 'grossly overpriced title insurance premiums'" "nothing more than a challenge to Florida's rate structure").  In challenging the DOI's rates, plaintiffs' complaint second-guesses the DOI's determinations of proper rates and thus poses a great threat to the legitimacy of the DOI's rate determinations.  On this basis, plaintiffs' complaint again runs directly afoul of the nonjusticiability principle, which protects the DOI's rate determinations.  *See Hill v. BellSouth Telecomms., Inc.*, 364 F.3d 1308, 1317 (11th Cir. 2004) (finding that "award of damages to the customer . . . would, in effect, result in a judicial determination of the reasonableness of that rate is prohibited under the filed rate doctrine" based on nonjusticiability principle); *see also H.J.*, 954 F.2d at 490.

Adjudication of plaintiffs' complaint would similarly impose upon DOI procedures.

Plaintiffs allege the DOI allegedly lacks the resources to investigate whether rates defendants submitted comply with the standards for title insurance rates, in particular the requirement that rates "shall . . . not be excessive." 40 Pa. Stat. Ann. § 910-39(b). In objecting to the DOI's alleged inability to investigate rates when filed, plaintiffs overlook mechanisms in the statutory scheme for post-filing review of title insurance rates. First, at any time and pursuant to DOI review, the commissioner of the DOI may declare ineffective any filed rate that does not meet the standards for title insurance rates, provided that beforehand the commissioner holds a hearing on the defective rate. *Id.* §§ 910-40(a). Second, purchasers of title insurance themselves can appeal to the DOI if they are "aggrieved with respect to any filing that is in effect."[16] 40 Pa. Stat. Ann. § 910-40(b). If the DOI finds that the rate in question, or any part thereof, "does not meet the requirements" governing title insurance, then the DOI shall order that rate, or part thereof, no longer effective. *Id.*

Given the DOI's extensive framework for *post-filing* review, adjudication of plaintiffs' complaint based on allegations concerning the DOI's limited *initial review* would severely frustrate the DOI's overall review procedures. Of course, a court's imposition on agency procedures would, in effect, bypass the agency's use of its specialized knowledge of title insurance to apply the court's comparably limited knowledge—a further intrusion on agency authority. *See Wegoland*, 27 F.3d at 21 (finding nonjusticiability principle implicated because "regulators who are intimately familiar with the industry are best situated to discover when regulated entities engage in fraud on the agency and to remedy the wrongdoing"). To protect

---

[16] In no place in their complaint do plaintiffs state that they availed themselves of this opportunity.

DOI authority over its procedures and give proper deference to agency expertise, as the nonjusticiabilty principle demands, the filed rate doctrine applies to preclude this court's adjudication of plaintiffs' complaint for damages. *See H.J.*, 954 F.2d at 493 (applying filed rate doctrine, despite fraud on agency, to prevent encroachment on agency's regulatory authority).

Turning to plaintiffs' argument that the DOI can not provide an adequate remedy for antitrust violations in the sale of title insurance, plaintiffs appear to overlook that the statutory and regulatory scheme provides remedies for injuries caused by non-compliant title insurance rates. Purchasers of title insurance can appeal to the DOI where they feel they have been charged rates that do not meet governing requirements. Moreover, in addition to all other powers enumerated in the statutory scheme, the commissioner of the DOI "shall have *full* power and authority, and it shall be his duty, to enforce and carry out by regulations, orders or otherwise, all and singular the provisions of this article and the full intent thereof." 40 Pa. Stat. Ann. § 910-46(d) (emphasis added). Previously, the commissioner has used this authority to grant rebates to purchasers of insurance who appealed the rates they paid. *See Pechner, Dorfman, Wolffe, Rounick and Cabot v. Pennsylvania Ins. Dept.*, 452 A.2d 230, 233 n.8 (Pa. 1982) (noting that "applicable statutes" do not preclude Commissioner's "power to grant a full refund"); *Welsch v. Aetna Ins. Co.*, 494 A.2d 409, 412-13 (Pa. Super. Ct. 1985) (holding that under § 910-46(d), commissioner had "power to fashion a remedy for insureds aggrieved by unfair rates" and such remedy could include a refund, where appropriate). *But see John Hancock Prop. & Cas. Ins. Co. v. Commw., Ins. Dep't*, 554 A.2d 618, 621-22 (Pa. Commw. Ct. 1989) (prohibiting DOI from using same order to require refund of premiums and disapprove rate previously filed and approved).

Because the DOI can remedy any alleged overpayments plaintiffs may have made due to non-compliant title insurance rates, any adjudication from this court would constitute a major intrusion into the DOI's remedial authority. *See Taffet v. So. Co.*, 967 F.2d 1483, 1494 (11th Cir. 1992) (en banc) (applying filed rate doctrine because "a court's award of damages . . . would be unnecessarily disruptive to the state's [regulatory] scheme" where agency could provide remedy by taking "defendants' fraud into account in setting future rates"). Likewise, other filed rate doctrine cases note that because plaintiffs could, and should, seek remedies with appropriate regulatory agency, the filed rate doctrine precludes court action. *See Keogh*, 260 U.S. at 162 (precluding antitrust action because plaintiffs could recover in agency proceeding damages from conspiracy to charge unreasonably high rates); *H.J.*, 954 F.2d at 493 (applying filed rate doctrine because "another forum exists for telephone customers to recover the alleged overcharges"). Because the DOI can more than adequately remedy plaintiffs' alleged injuries, the nonjusticiability principle demands applying the filed rate doctrine to preclude plaintiffs' claim for damages. *See Wegoland*, 27 F.3d at 21 (applying filed rate doctrine based on nonjusticiability principle because agency better suited to "issue appropriate remedies to benefit the ratepayers"); *cf. McCray*, slip. op. at 18 (finding regulatory agency's authority to lower rates prospectively provides adequate remedy for past rate injuries). In sum, because adjudication of plaintiffs' complaint both asks this court to determine damages based on hypothetical reasonable title insurance rates and impacts the DOI's rate determinations and procedures, it runs afoul of the nonjusticiability principle. Consequently, the filed rate doctrine should apply to preclude plaintiffs' claim for damages.

### b.    Nondiscrimination

The parties also dispute whether in fashioning their complaint as a class action, plaintiffs removed the central concern associated with the nondiscrimination principle: that plaintiffs would receive title insurance at a discount unavailable to other rate-payers. In *Square D*, the Court explained that "the development of class actions, which might alleviate the expressed concern about unfair rebates," "undermine[s] some of the reasoning in . . . *Keogh*," but relying on the principle of *stare decisis* the Court declined to overrule the filed rate doctrine. 476 U.S. at 423.

Similarly, other courts have recognized that "the concerns for discrimination are substantially alleviated in [a] putative class action," *Wegoland*, 27 F.3d at 22, but have applied the filed rate doctrine based on its other underlying "important concerns of agency authority, justiciability, and institutional competence," *id. See Sun City Taxpayers' Ass'n v. Citizens Utils. Co.*, 45 F.3d 58, 62 (2d Cir. 1995) (applying filed rate doctrine because "whether or not the plaintiffs are suing for a class" is irrelevant to importance of honoring nonjusticiability principle (quoting *Wegoland*, 27 F.3d at 22)). In light of the above, the court recognizes that a class action can significantly alleviate concern over discriminatory pricing underlying the filed rate doctrine. *But see Marcus*, 138 F.3d at 61 (concluding that Supreme Court rejected argument that nondiscrimination principle is inapplicable to class action).

Here, although in bringing a class action plaintiffs reduce concerns about any price discrimination inherent in their suit, those reduced concerns alone can not render the filed rate doctrine inapplicable. Because plaintiffs' class includes *all* those who purchased title insurance in Pennsylvania from defendants during the antitrust conspiracy, no single person who bought title insurance from any defendant would end up paying a different rate. Thus, plaintiffs' class

lacks the regional distinctions within the class that provided the basis for other courts to apply the filed rate doctrine under the nondiscrimination principle.  *See Crumley v. Time Warner Cable, Inc.*, 554 F. Supp. 2d 933, 936-37 (D. Minn. 2008) (relying on nondiscrimination principle to apply filed rate doctrine to class action complaint because class included only rate-payers from particular city, not all rate payers state-wide), *aff'd*, 556 F.3d 879 (8th Cir. 2009); *A.S.I. Worldwide Commc'ns Corp. v. WorldCom, Inc.*, 115 F. Supp. 2d 201, 211 (D.N.H. 2000) (finding nondiscrimination principle implicated where state law cause of action would result in different federally regulated rates paid in different states).  Because plaintiffs' putative class lacks these distinctions, any award of damages will not result in any discrimination among rate payers.  *See Gelb*, 813 F. Supp. at 1030-31 (finding filed rate doctrine inapplicable where no "other individuals would be left to pay the lawfully filed rate," a result in line with "legislative intent in mandating uniform rates").  Accordingly, plaintiffs' class action complaint does not implicate the concerns underlying the nondiscrimination principle.

Nevertheless, plaintiffs' complaint presents a situation similar to the cases cited above where courts applied the filed rate doctrine, even after acknowledging that the nondiscrimination principle has less relevance to a class action.  In those cases, concerns other than nondiscrimination, such as the encroachment on agency competence, warranted applying the filed rate doctrine.  *See, e.g.*, *Wegoland*, 27 F.3d at 22.  Similarly, in this case, other concerns do favor applying the filed rate doctrine, as the court explained earlier.  Consequently, although plaintiffs' complaint does not implicate the nondiscrimination principle (unless, of course, the class is eventually not certified), the filed rate doctrine still applies because of other significant reasons, such as the nonjusticiability principle.

### 5.      Filed rate doctrine applies

The court concludes that the filed rate doctrine applies and precludes plaintiffs' claim for damages as all of plaintiffs' arguments to the contrary fail.  No authority in the Third Circuit establishes a meaningful review requirement for application of the filed rate doctrine; therefore, despite plaintiffs' claims, the capacity of the DOI to review initially submissions of title insurance rates has no bearing on application of the filed rate doctrine.  Because plaintiffs have not alleged significant defects in defendants' submissions to the DOI, plaintiffs can not seek to preclude application of the filed rate doctrine for defendants' alleged failure to file rates properly. In challenging the collective action inherent in TIRBOP's rate submissions, plaintiffs' complaint make a direct attack on rate-related conduct, to which the Third Circuit's *Lake Erie* exception to the filed rate doctrine does not apply.  Finally, because adjudication of plaintiffs' complaint will interfere with the DOI's determination of reasonable title insurance rates, the nonjusticiabilty principle justifies the doctrine's application here.  Because the court finds that the filed rate doctrine applies and precludes plaintiffs' claim for antitrust damages, plaintiffs plead a claim for which the court can not grant relief and the court will grant defendants' motion to dismiss this part of plaintiffs' complaint with prejudice.[17]

### C.      Injunctive Relief and the Filed Rate Doctrine

Plaintiffs also seek injunctive relief, specifically an order forbidding defendants from continuing the conspiracy as alleged in the complaint or initiating a similar one.  Defendants

---

[17]  Due to the preclusive effect of the filed rate doctrine, plaintiffs' claim for damages fails as a matter of law.  Therefore, no amendment can cure this problem and dismissal with prejudice is warranted.  *See Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004) ("[I]f a complaint is vulnerable to 12(b)(6) dismissal, a District Court must permit a curative amendment, unless an amendment would be inequitable or futile.").

argue that the filed rate doctrine bars injunctive relief in the context of an antitrust action, where, as in this case, any prohibition on collective rate-making would require an alteration of filed rates.  Because the filed rate doctrine precludes only suits for *damages* based on rate-related antitrust violations, the Supreme Court has recognized that the doctrine does not apply to claims for injunctive relief.  *See Georgia v. Pa. R.R. Co.*, 324 U.S. 439, 462 (1945) (holding that plaintiff could bring antitrust action to enjoin alleged "coercive and collusive influences" in rate-making); *Square D*, 476 U.S. at 419, 422 & n.28 (explaining that for rate-related claims *Keogh* only precluded antitrust actions for treble damages; thus injunctive antitrust actions permitted); *Saunders v. Farmers Ins. Exch.*, 440 F.3d 940, 944 & n.1 (8th Cir. 2006) (noting that *Square D* and *Keogh* collectively stand for proposition that filed rate doctrine precludes antitrust claims for damages, but permits antitrust claims for injunctive relief).

Even so, under the nonjusticiability principle, the filed rate doctrine can apply to claims for injunctive relief when a plaintiff seeks an injunction that would result in altering a filed rate or its collection.  *See Town of Norwood*, 202 F.3d at 420 (applying filed rate doctrine to deny injunctive relief because it "would require the *alteration* of tariffs" already filed and thus encroach on agency's authority (emphasis in original)).  Naturally then, the court can properly enjoin anticompetitive activity to prevent future conduct that could give rise to rates not yet filed.[18]

---

[18]  *See generally* 1A Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 247d, at 423 (3d ed. 2006) (explaining that under the injunction exception to the filed rate doctrine, courts may properly issue an injunction "against an antitrust violation attending some tariff" defendants might or would file, but not an injunction requiring "a firm to charge in the future a different rate than [one] previously filed").

Plaintiffs seek an injunction to prevent defendants from: (1) collectively setting title insurance rates at supra-competitive prices, (2) including the costs of kickbacks and inducements in determining rates, and (3) hiding those costs in submissions to the DOI.  The proposed injunction would bar defendants from producing any newly filed rates in the future by means of the alleged conspiracy.  Thus, the injunction concerns conduct separate and apart from charging any already filed rate that the conspiracy has allegedly already produced.  Because plaintiffs seek exclusively prospective relief, their injunction will in no way interfere with or alter any already filed rate and, as a result, the filed rate doctrine can not preclude this relief.  *Cf. Green v. Peoples Energy Corp.*, No. 02 C 4117, 2003 WL 1712566, at *4 (N.D. Ill. Mar. 28, 2003) (holding that filed rate doctrine precluded plaintiffs' desired injunctive relief because proposed injunction necessitated "altering the filed rates"); *In re Cal. Wholesale Elec. Antitrust Litig.*, 244 F. Supp. 2d 1072, 1078 (S.D. Cal. 2003) (holding that filed rate doctrine barred claim where plaintiffs' "request for injunctive relief [sought] to enjoin conduct subject to the tariffs filed"), *aff'd*, 384 F.3d 756 (9th Cir. 2004).  Accordingly, the court will deny defendants' motion to dismiss plaintiffs' claim for injunctive relief.

### D.    Liability of Parent Entities

Plaintiffs' complaint includes as defendants not only title insurers who set prices collectively through TIRBOP, but also their parent corporations.[19]  Defendants argue that the court must dismiss the complaint as to parent defendants for failure to allege that any of them

---

[19]  Those corporate parent defendants include: Fidelity National Financial, Inc.; First American Corporation; Stewart Information Services Corporation; and Old Republic International Corporation.  *See supra* Section I.C., note 3.

participated in the conspiracy.[20]  In response, plaintiffs point to their allegation that the parents

participated in the conspiracy by assenting to and approving of their subsidiaries' conduct.

To plead a § 1 violation, a plaintiff must allege "that the defendant was a party to a

'contract, combination . . . or conspiracy.'"  *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*

["*Toledo*"], 530 F.3d 204, 218 (3d Cir. 2008) (quoting 15 U.S.C. § 1).  "The essence of a Section

1 claim is the existence of an agreement."  *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d

Cir. 2005) (citation omitted), *cert. denied*, 547 U.S. 1092 (2006).  "[C]ourts have interpreted

[the] language [of § 1] to require 'some form of concerted action.'"  *In re Flat Glass Antitrust*

*Litig.*, 385 F.3d 350, 357 (3d Cir. 2004).  "Concerted action" consists of "two or more distinct

entities . . . agree[ing] to take action against the plaintiff," *Gordon*, 423 F.3d at 207 (citations

omitted), such that "the alleged conspirators had a unity of purpose or a common design and

understanding, or a meeting of the minds," *Toledo*, 530 F.3d at 219 (quotation and citation

omitted).  Participation in a conspiracy under § 1 does not depend on "any overt act other than

the act of conspiring . . ., [i.e.] aid[ing] or assist[ing] in carrying out the purposes of the

conspiracy."  *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 763 F.2d 1482, 1491 (3d Cir. 1985),

*vacated and remanded on other grounds*, 475 U.S. 1105 (1986), *reinstated*, 823 F.2d 49 (3d Cir.

1987).

Under the "general principle of corporate law deeply 'ingrained in our economic and legal

---

[20]  Initially, defendants argued that the parents could not be held vicariously liable for
their subsidiaries' participation in the alleged conspiracy.  (Defs.' Mem. Law Supp. Joint Mot. to
Dismiss Consolidated Comp. with Prejudice 11-12.)  In response, plaintiffs explicitly disavowed
that they seek "to impose vicarious liability" on parent defendants for their subsidiaries' conduct.
(Pls.' Mem. Law Opp'n Ds.' Joint Mot. to Dismiss Consolidated Compl. 32 n.20.)  Therefore,
the court will not consider the issue of parents' vicarious liability for subsidiaries' participation
in the alleged conspiracy.

systems[,]' . . . a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998). Courts have applied this principle in the context of anti-trust cases. *See In re Pressure Sensitive Labelstock Antitrust Litig.*, 356 F. Supp. 2d 484, 494 (M.D. Pa. 2005) ("'[A] parent corporation is not liable for the acts of its subsidiary allegedly in violation of federal antitrust laws simply by virtue of that ownership interest.'" (quotation and citation omitted)), *modified*, 566 F. Supp. 2d 363, 376 (M.D. Pa. 2008); *Cupp v. Alberto-Culver USA, Inc.*, 310 F. Supp. 2d 963, 974 (W.D. Tenn. 2004) (stating "mere existence of a corporate relationship [does not] implicate a parent in its subsidiary's actions"). Thus, plaintiffs can not rely merely on the parents' ownership interest in their respective subsidiaries to sustain a § 1 claim against parent defendants.

Moreover, the Supreme Court held in *Copperweld Corp. v. Independence Tube Corp.* that a parent corporation and its wholly owned subsidiary can not incur § 1 liability for conspiring with each other. 467 U.S. 752, 777 (1984). Because a "parent and its wholly owned subsidiary have a complete unity of interest," *id.* at 771, any agreement between the two can not create the "sudden joining of economic resources that had previously served different interests [that justifies] § 1 scrutiny,"[21] *id.* Because a parent and its wholly owned subsidiary lack the capacity for any meeting of the minds and thus any concerted action, they can not form an agreement, the essence of a § 1 claim. *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1000 (3d Cir.

---

[21] The Court further explained that a "parent and a wholly owned subsidiary always have a 'unity of purpose or a common design,'" *Copperweld*, 467 U.S. at 771 (quotation and citation omitted), as the parent "may assert full control at any moment if the subsidiary fails to act in the parent's best interests," *id.* at 771-72.

-40-

1994) ("[A]ctivity undertaken jointly by a parent corporation and its wholly owned subsidiary . . . can [not] form the [basis] of [a] section 1 violation[].").  Under *Copperweld* and its progeny, plaintiffs can not base their § 1 conspiracy claim solely on any agreement between each parent defendant and any of its wholly owned and controlled subsidiaries.[22]

Thus, to state a claim against parent corporations, plaintiffs must set forth facts establishing the parent corporations' direct and independent participation in the alleged conspiracy.  *See McCray*, slip. op. at 25 (requiring for "claim against a parent corporation . . . [allegations of] facts sufficient to infer . . . direct involvement"); *In re Pressure Sensitive*, 566 F. Supp. 2d at 375-77 (finding insufficient allegations that parent participated in antitrust conspiracy on its own, even though court already found sufficient allegations that subsidiary did participate); *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.* ["*NIPP*"], 311 F. Supp. 2d 1048, 1068-69 (D. Colo. 2004) ("Absent allegations or evidence of 'independent conduct' on the part of the parent, there is no basis upon which to hold a parent directly liable for the acts of a subsidiary.").  The court must determine whether under *Twombly*, plaintiffs have alleged sufficiently independent participation in the conspiracy on the part of the parents.

Here, in alleging liability of the parents, plaintiffs do not rest merely on the parents' ownership interest in their respective subsidiaries or solely on any agreements parents made with their subsidiaries.  Instead, plaintiffs argue that they have set forth direct and independent participation by the parents.  According to plaintiffs, the conspiracy originated in unrelated

---

[22] Plaintiffs allege that some parent defendants wholly own *and* control their subsidiaries, (*e.g.*, CC ¶ 14), while others wholly own *and/or* control their subsidiaries, (*e.g.*, CC ¶ 12).  For the purposes of this motion, the court will read the complaint in the light most favorable to the plaintiffs and presume that all corporate parents wholly own and control their respective subsidiaries.

subsidiaries conspiring through their membership in TIRBOP to charge supra-competitive rates. As for corporate parents' role in the conspiracy, they allegedly participated by giving their assent and approval to their respective subsidiaries' conduct. Plaintiffs also allege that parent defendants had ownership and control of their respective subsidiaries. "Approval and assent" and "ownership and control" constitute the entirety of plaintiffs' allegations of parents' participation. Plaintiffs offer nothing else. Plaintiffs fail to allege, or even explain, how parent defendants' approval and acquiescence aided or assisted their subsidiaries or others in carrying out the conspiracy. *Tunis Bros. Co., Inc.*, 763 F.2d at 1491; *see McCray*, slip op. at 25 ("Without some averment that the corporate parents directly entered into the agreements, . . . the plaintiffs have not alleged enough to establish that the corporate parents entered into a conspiracy to fix title insurance [rates]."); *In re Calif. Title Ins. Antitrust Litig.*, No. C 08-01341 JSW, slip op. at 12 (N.D. Cal. May 21, 2009) (finding allegations of parental participation in conspiracy by ownership and approval insufficient). In short, plaintiffs' bare allegations fail to provide parent defendants fair notice of grounds for plaintiffs' claim against them. *Twombly*, 550 U.S. at 555.

Even applying a loose standard of independent and direct participation under *Copperweld*, the paucity of plaintiffs' allegations fails to set forth a claim against the parents. The *Copperweld* court explained that, due to the unity of interest between a parent and subsidiary, "the *coordinated activity* of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1." 467 U.S. at 771 (emphasis added); *see Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 857 (10th Cir. 1999) (emphasizing that coordinated activity of parent and subsidiary warrants treating them as one entity for purposes of § 1 liability). Consequently, as one district court held, when a "parent controls, directs, or

encourages the subsidiary's anticompetitive conduct, the parent engages in sufficient independent conduct to be held directly liable as a single enterprise with the subsidiary under the Sherman Act." *NIPP*, 311 F. Supp. 2d at 1070.  In other words, when a parent directs its subsidiary to carry out the parent's anticompetitive designs, the parent essentially uses its subsidiary to violate antitrust laws, which constitutes sufficient independent participation in the conspiracy by the parent for it to incur § 1 liability.  *See id.* at 1069 (calling it "counterintuitive" to allow parent to "direct . . . anticompetitive conduct of its subsidiaries, . . . [but] then escape antitrust liability by hiding behind its separate incorporation").  Nevertheless, "circumstances . . . typical of any parent and subsidiary," *Mitchael*, 179 F.3d at 857 n.12, do not constitute "specific [allegations] of coordinated activity," *id.* at 857, between a parent and a subsidiary sufficient for § 1 liability.

Plaintiffs' complaint fails to set forth allegations that meet the *Twombly* standard. Viewing plaintiffs' allegations of "approval and assent" and "ownership and control" in a light most favorable to plaintiffs, as the court must for the purposes of this motion, these allegations amount to nothing more than conduct "typical of any parent and subsidiary."  *Mitchael*, 179 F.3d at 857 n.12.  Because plaintiffs allege that parents merely acquiesced in their subsidiaries' conduct, the complaint lacks the "specific [allegations] of coordinated activity," *id.* at 857, that shows that parents directed, controlled, or encouraged their subsidiaries' participation in the TIRBOP scheme, *NIPP*, 311 F. Supp. 2d at 1070.  Although plaintiffs need not present detailed allegations, plaintiffs here rely on general statements that barely rise above mere labels and conclusions and thus hardly raise a right to relief above a speculative level.  *Twombly*, 550 U.S. at 555.  Because plaintiffs' pleading fails the *Twombly* standard, plaintiffs have failed to set forth a claim for relief and the court will grant defendants' motion and dismiss the complaint, without

-43-

prejudice, as to the parent defendants.[23]

## III.   Conclusion

For the reasons above, the court finds the filed rate doctrine precludes plaintiffs from seeking antitrust damages arising out of defendants' collective setting of title insurance rates. Still, the filed rate doctrine does not preclude plaintiffs' request for injunctive relief. Plaintiffs have not sufficiently alleged participation in the conspiracy on the part of the parent defendants. Consequently, the court will grant defendants' motion to dismiss plaintiffs' claim for damages with prejudice, will deny the motion to dismiss with respect to plaintiffs' request for injunctive relief, and will grant defendants' motion to dismiss all claims against defendants Fidelity National Financial, Inc.; First American Corporation; Stewart Information Services Corporation; and Old Republic International Corporation without prejudice. An appropriate order follows.

---

[23]   Because plaintiffs could amend their complaint with allegations of parent defendants' independent participation in the alleged conspiracy, the court does not find dismissal with prejudice warranted. *See Alston*, 363 F.3d at 235.