## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| *In re: Pennsylvania Title Insurance Antitrust Litigation* | : : : : | No. 08cv1202-WY<br><br>CONSOLIDATED |

### Memorandum

YOHN, J.                                                                          November 30, 2010

      Plaintiffs, purchasers of title insurance in Pennsylvania, have filed this action alleging antitrust violations by various title insurance companies ("the Insurers") and the Title Insurance Rating Bureau of Pennsylvania ("TIRBOP") arising out of a conspiracy to fix rates for title insurance purchased in Pennsylvania.[1] This suit began as a series of separate class actions by named plaintiffs against various defendants. Pursuant to an order from this court consolidating these actions, plaintiffs filed a consolidated complaint that raises one claim for violation of § 1 of the Sherman Act (15 U.S.C. § 1 (2006)). Presently before the court is defendants' motion for summary judgment. Defendants argue that they are immune from antitrust liability because the Insurers' collective rate filings through TIRBOP (1) constituted state action because they were authorized by a clearly articulated state policy and were actively supervised by a state agency; and (2) were covered by the McCarran-Ferguson Act, 15 U.S.C. § 1012(b), which exempts the business of insurance from federal antitrust laws to the extent that such business is regulated by state law. I conclude as a matter of law that defendants' collective rate filings constitute state action outside the scope of the Sherman Act and will therefore grant summary judgment to defendants. Because my resolution of the state action

---

[1] I dismissed plaintiffs' claims against the corporate parents of the Insurers on July 21, 2009. *See In re Pa. Title Ins. Litig.*, 648 F. Supp. 2d 663, 690 (E.D. Pa. 2009).

issue is dispositive of plaintiffs' claims, I do not reach the question of whether the McCarran-Ferguson Act also exempts defendants from liability under the Sherman Act.

## I.    Facts and Procedural Background

Discovery so far has been limited to issues relevant to the state action doctrine and McCarran Act defenses. (*See* Scheduling Order (Doc. # 137), Aug. 24, 2009.) In order to provide necessary background, I also draw facts from plaintiffs' Consolidated Complaint ("CC"). As is appropriate on a motion for summary judgment, I view any disputed facts in the light most favorable to the plaintiffs.

### A.    Parties

The named plaintiffs are all Pennsylvania residents who purchased title insurance directly from one of the defendants and, allegedly, have been injured as a result of defendants' collective rate-filing practices. They bring this class action on behalf of all purchasers of title insurance on property in Pennsylvania from one of the Insurers on or after March 11, 2004. (CC ¶ 27.)

The Insurers are title insurance companies doing business in Pennsylvania. Together, the Insurers control over 97% of the market for title insurance in Pennsylvania. (*Id.* ¶ 35.) The Insurers are not all under the same general management or control. (Plaintiffs' Counterstatement of Material Facts ("PCS") ¶ 39.) All Insurers file rate proposals with the Pennsylvania Department of Insurance ("DOI") through TIRBOP, a voluntary association of title insurers also named as a defendant in this action. (CC ¶¶ 22, 24.)

### B.    Title Insurance and the Title Insurance Industry

Title insurance protects homebuyers and mortgagors against losses arising out of defects in title that existed at the time of the sale or mortgage. Before a title insurer issues a policy, a title insurance agent, independent attorney, or employee of the title insurance company must search and

examine public records in order to identify any potential defects, such as liens or encumbrances. *See* 40 Pa. Stat. Ann. § 910-7. In general, any significant defects that the examination reveals will be excluded from the policy. (CC ¶ 2.) As a result, "the title insurer's function is primarily to prevent losses by reducing the insured's ignorance of the state of title to the lowest possible level, and only secondarily to pay losses when some element of ignorance has not been eliminated" by the title search and examination. (*See* Plaintiffs' Response to Defendants' Statement of Undisputed Facts ("PRDS") Ex. 13, at 6 (Apr. 17, 2009, letter from Ronald Chronister to Chuck Romberger (quoting Nelson R. Lipshutz, *The Regulatory Economics of Title Insurance* (1994))).) The policy buyer makes a one-time payment for coverage that lasts as long as the buyer retains an interest in the property. (*See* DS ¶ 78.)[2] The amount of the premium does not generally vary according to the likelihood of a loss or the cost of performing the title search or examination but rather varies according to the value of the property to be insured or, when the insured is a mortgagor, according to the amount of the mortgage. (CC ¶ 37.)

In Pennsylvania, title insurance premium rates are regulated by the Department of Insurance as required by the Pennsylvania Title Insurance Act (the "Act"), 40 Pa. Stat. Ann. §§ 910-1 to 910-54. Each title insurance company doing business in Pennsylvania is required to file with DOI a schedule of rates it plans to charge purchasers. 40 Pa. Stat. Ann. § 910-37(a). A title insurance

---

[2] Although plaintiffs dispute this portion of defendants' statement of facts, the evidence they cite in rebuttal tends only to show that covering such losses is not the main function of title insurance. (*See* PRDS ¶¶ 74-76; Pls.' Ex. 13, at 5-7; Pls.' Ex. 2 at 121, 139.) It therefore appears that plaintiffs do not dispute the existence of a one-time payment but rather dispute defendants' characterization of the payment as an insurance premium. Plaintiffs argue that they instead purchased title insurance policies "as warranties to protect themselves, *inter alia*, in the event that an adequate search of the title was not performed." (*See* PRDS ¶ 74.) Because the distinction between an insurance policy and a warranty is relevant only to the application of the McCarran-Ferguson Act and not the state action doctrine, I need not resolve the parties' dispute as to whether the payment is best characterized as a "premium."

company may satisfy this filing obligation by becoming a member of, or a subscriber to, a licensed rating organization such as TIRBOP and by authorizing the organization to submit rate filings on its behalf. *Id.* §§ 910-37(b), 910-41. (*See* DS ¶¶ 1-3.) The Insurers have all opted to submit their rate filings through TIRBOP. (CC ¶ 21.) As a result, they all use the same schedule of rates. (*Id.*)

Each title insurer or rating organization that submits a rate filing to DOI must also provide a statement explaining the economic basis for the proposed rate. 40 Pa. Stat. Ann. § 910-38. DOI is required to review each filing to ensure compliance with the Act's standards for appropriate title insurance rates, including the Act's requirement that rates not be "inadequate" or "excessive" and that they permit title insurers to earn a "reasonable profit." *Id.* §§ 910-39(b), 910-37(c). Any rate that becomes effective shall be "deemed to meet" these requirements. *Id.* § 910-37(e). Typically, any rate filing becomes effective upon agency approval or within thirty days of filing, unless specifically disapproved by DOI. *Id.* § 910-37(d). The thirty-day waiting period may be extended once upon notice to the party making the rate filing and may be extended further with the consent of the party submitting the filing. *Id.* An individual title insurer must charge rates in accordance with those filed and approved by the DOI. *Id.* § 910-37(h).

## C.    Title Agent Commissions

Title insurance presents a unique regulatory challenge to the DOI in that a comparatively small portion of each title insurance premium goes toward paying eventual claims, while approximately 82% of each premium is paid as a commission to the title agent or attorney who conducted the title search and examination. (PCS ¶¶ 6, 35; Defendants' Statement of Undisputed Facts in Supp. of Mot. Summ. J. ("DS") Ex. NN; Pls.' Ex. 13, at 6-7.) In contrast, in other insurance industries, the agent's commission is around 10-15%. (PCS ¶ 8.) This is because, unlike most lines of insurance in which "the risk insured is grounded in the uncertainty of the future," title insurance

protects only against losses arising out of defects in the title existing at the time of closing, most of which can be identified and either remedied or excluded before issuing a policy. (PCS ¶ 34; Pls.' Ex. 13, at 5-7; CC ¶ 2.) As a result, the "loss ratio in title insurance is exceedingly low." (PCS ¶ 35 (quoting Pls.' Ex. 2, at 121 (hearing testimony of Ron Chronister)).) Title insurers also pay comparatively high commissions to title agents in part because it is the title agent who performs the title search and examination and in part, according to plaintiffs, because title insurers provide agents with inducements and kickbacks in exchange for customer referrals. (CC ¶¶ 41, 42.)

Because title insurance agent commissions form the bulk of title insurance rates, plaintiffs assert that DOI must regulate the agent commissions component of those rates in order to regulate the rates effectively. (PCS ¶ 36.) In its regulation of other insurance industries, however, DOI typically does not review agent commissions to determine whether they are reasonable. (PCS ¶ 9.) Although the DOI has, since 2000, received yearly analyses of TIRBOP's economic data conducted by Dr. Lipshutz of the Regulatory Research Corporation (*see* DS ¶ 67), plaintiffs argue that the data contained in these reports do not permit any meaningful analysis of title insurance agent commissions (*see* PRDS ¶ 67; Pls.' Ex. 15 (statistical analysis by Dr. Lipshutz analyzing title insurance costs and revenue, with no breakdown of title agent commissions)).[3]

D.    **TIRBOP's Most Recent Rate Filing**

On February 2, 2009, TIRBOP submitted a rate proposal to DOI that sought to: (1) simplify the rate structure for title insurance policies, (2) propose a new form Closing Service Letter ("CSL") that would expand title insurance protection to cover the purchaser or lessee of real property—as opposed to only the lender—and raise the price of the CSL from $35 to $75; and (3) increase rates

---

[3] Although defendants present evidence that the DOI has, in the past, requested further information from TIRBOP about these reports, this request did not involve information on agent commissions. (*See* DS Ex. UU.)

for policies above $30 million. (DS ¶ 7, *id.* Ex. B.) TIRBOP characterized the rate structure simplification as "revenue-neutral" as it was not expected to increase or decrease the industry's profitability. (DS Ex. B, at 2.) The rate increases for high-value policies, on the other hand, were intended to increase revenue for the industry, which TIRBOP characterized as increasingly unprofitable, in light of changed economic conditions. (*Id.* at 3-4.) TIRBOP justified the CSL price increase both in terms of the need to increase profitability and the need to offset the extra risk that insurers would assume under the new form CSL. (*Id.*)

DOI extended the review period for TIRBOP's filing by thirty days and posted a notice in the Pennsylvania Bulletin requesting public comments on TIRBOP's proposal. (DS ¶¶ 9-10.) On March 16, 2009, Pennsylvania's Office of the Attorney General ("OAG") submitted objections to TIRBOP's rate filing. (DS ¶ 11.) OAG primarily argued that title insurance agent commissions were excessive in comparison to the commissions that other kinds of insurance agents earned and that the industry should lower its rates by reining in its commissions-related expenses. (*Id.*) Moreover, although TIRBOP justified its need for a rate increase in part based on increases in mortgage fraud, the Attorney General argued that such fraud did not actually increase risk to title insurers. (DS Ex. E (OAG Letter), at 2.) On March 18, 2009, DOI forwarded OAG's objections to TIRBOP and requested that TIRBOP consent to a sixty-day extension of the review period. (DS ¶ 14; PCS ¶ 20; DS Ex. E.) TIRBOP consented to the extension on March 27, 2009.

In late March, 2009, representatives of TIRBOP and DOI began meeting with each other to discuss how to proceed on TIRBOP's rate filing in light of OAG's objections. (PCS ¶ 21.) In a March 23, 2009, meeting, counsel for TIRBOP told DOI that, due to potential antitrust implications, they would "never recommend" that DOI simply allow the rate to "deem" into effect by allowing the

review period to elapse without DOI taking action. (PCS ¶ 22.)[4]

On March 26, 2009, Christopher Doane, General Counsel of DOI, emailed Department Counsel Amy Daubert, stating that he had "everything figured out" and suggesting that DOI "move ahead with an informational hearing on title issues (including the AG's letter) without worrying about the pending [TIRBOP] filing." (PCS ¶ 23; Pls.' Ex. 7.) That same day, Doane met with Kevin Brobson, attorney for TIRBOP, and "explained that [DOI was] not intending to hold [an] adversarial hearing to disapprove [the] filing at this point (though everything is on the table)" but that DOI "would be hard pressed to affirmatively approve [the filing] unless and until [there] was a public forum for the AG to vent their concerns (probably public info hearing on broader title issues - not just filing)." (PCS ¶ 24; Pls.' Ex. 8, at 1.) Doane further stated that, "short of [the] AG publicly retracting [its] comments," he did not "see any other way" that the filing could be affirmatively approved "unless [a] public hearing took place within [the] next 60 days." (*Id.*) Brobson informed Doane that he planned to meet with OAG in order to attempt to persuade it to retract its opposition to the rate increase in order to avoid the need for a hearing. (*Id.* at 2.) Doane advised Brobson to "be circumspect & not mention any of our informal discussions" to OAG. (*Id.*) On April 16, 2009, TIRBOP representatives met again with DOI and discussed TIRBOP's meeting with OAG and TIRBOP's responses to OAG's criticisms. (PCS ¶ 26.)

On April 17, 2009, TIRBOP sent DOI a written response to OAG's objections. (DS ¶¶ 12-13; DS Ex. F.) TIRBOP repeated that its rate simplification proposal was revenue-neutral. (DS Ex. F, at 1.) It further emphasized that only the rate increase for policies above $30 million, and not the rate

---

[4] As is discussed in further detail *infra*, in *FTC v. Ticor Title Ins. Co. ("Ticor II")*, 504 U.S. 621 (1992), the Supreme Court held that "state action" immunity was unavailable to title insurers that collectively submitted rate filings to the state agency because those filings had gone into effect despite the agency's failure to perform any substantial review.

increase for the CSL, was "subject to agent's commission retention." (*Id.* at 3.) Finally, TIRBOP discussed the economic merits of OAG's objections and argued, *inter alia*, that title insurance agents performed substantially different functions than other insurance agents, in particular the title search and examination, which justified the higher commission rates they received. TIRBOP also argued that mortgage fraud had led to an increase in title insurance losses and that, in fact, "mortgage fraud is one of the major causes of title insurance losses." (*Id.* at 6-10.) Finally, TIRBOP noted that, in its objections, "[t]he OAG is not questioning the merit of the current filing; rather, the OAG seems to be questioning generally whether the commissions paid to title agents are reasonable within the context of the services provided by the title agents." (*Id.* at 10.) As a result, TIRBOP suggested that DOI consider OAG's objections "separately from its review of the rate filing." (*Id.* at 11.)

In another letter dated April 17, 2009, TIRBOP sent to DOI a written response to comments that DOI had received from Diane Cipa, a licensed title insurance agent, who also opposed the rate changes. (DS ¶¶ 15-16; DS Ex. I.) TIRBOP argued that Cipa's comments, which largely concerned misconduct and negligence by title agents that caused an increased risk of losses to insurers, were not relevant to TIRBOP's filing because Cipa did not recommend any solution to reduce those losses short of legislative action. (DS Ex. I.)[5]

On May 14, 2009, DOI and TIRBOP met again to discuss the upcoming hearing. DOI and TIRBOP discussed the anticipated testimony of representatives from TIRBOP, the American Land Title Association ("ALTA"), and the Pennsylvania Land Title Association ("PLTA"), and the anticipated remarks of various DOI officials. (*See* PCS ¶ 27; Pls.' Ex. 10.) In particular, it was proposed that TIRBOP's general counsel, Ron Chronister, speak for approximately ten minutes and

---

[5] Cipa also spoke at the May 28, 2009, hearing in favor of allowing price competition among agents. (*See* Pls.' Ex. 2, at 177-179.)

8

that Dr. Lipshutz, who performs yearly analyses of TIRBOP's statistical data, speak on other topics such as the general health of the title insurance industry. (Pls.' Ex. 10, at 1.) DOI and TIRBOP discussed the basic points these proposed witnesses would make, most of which concerned title agent commissions. (*See id.*) In addition, TIRBOP informed DOI that it would "let [DOI] know" what questions it would like DOI to ask other witnesses. (*Id.* at 3.)

On May 19, 2009, DOI held a meeting with representatives of TIRBOP and other members of the title insurance industry, such as PLTA and ALTA. (PCS ¶ 28; Pls.' Ex. 11, at 1.) The DOI stated, by way of background, that it did not "see prob[lem]s" with TIRBOP's filing but that the "AG weighed in" and that, as a result, the DOI decided to hold a hearing for the purpose of allowing a "broader airing of concerns." (Pls.' Ex. 11, at 1.) Again discussed at this meeting was the likely testimony of certain witnesses scheduled to speak at the hearing. (Pls.' Ex. 11.) A significant portion of the discussion of anticipated testimony focused on the work that title agents do and the reasonableness of their commission payments. (*Id.*) DOI stated that the "industry does [a] good job of defending itself" and asked the industry representatives for "input" on questions to "ask their critics." (*Id.* at 1.)

The public hearing took place on May 28, 2009. (DS ¶ 20.) As planned, the hearing did not address the details of the proposed rate changes but rather focused on broader economic issues, including how to regulate agent commissions and whether those commissions were excessive or inadequate. (PRDS ¶ 20; Pls.' Ex. 2, at 9-10.) Twenty-five witnesses testified at the hearing, including representatives from OAG, TIRBOP, and independent title agencies. (DS ¶ 21; Pls.' Ex. 2, at 3-5.) Most of the witnesses had never been mentioned in the minutes of the prior organizational meetings between DOI and TIRBOP (*Compare* Pls.' Exs. 10, 11 *with* Pls.' Ex. 2, at 3-5 (Index of Witnesses).) Some witnesses testified that, in order to ensure that title insurance rates are regulated

effectively, it would be necessary to examine the reasonableness of title agent commissions. (PCS ¶ 36; Pls.' Ex. 2 at 139 (testimony of Dr. Lipshutz), 209-14 (testimony of Bruce Strombom for First American Title Insurance Company), 266 (testimony of Holly Keller, title insurance agent).) DOI Commissioner Joel Ario stated that DOI lacked sufficient cost data to conduct such an examination and sought input on how to obtain such data. *See, e.g.*, Pls.' Ex. 2, at 66 (describing agency commissions as a "complicated black box," stating that DOI did not "have a lot of experience at looking inside that," and requesting from a witness from OAG "any suggestions that you have for who can do that well for us if you don't think TIRBOP should do it and how we can best proceed on that").) In addition, some witnesses criticized the title industry and testified that rates were too high. (*See, e.g.,* Pls.' Ex. 2, at 57-68 (testimony of Jim Donahue from OAG), 109-17 (testimony of Professor Joseph Eaton).)

On June 8, 2009, following the hearing, DOI officials met with TIRBOP's counsel and with Laura Fox from Lawyers' Title Insurance Company. (PCS ¶ 31; Pls.' Ex. 12.) DOI stated that it wanted a "better handle on costs / rev[erse] competition" in order to "address those issues before considering [the] need for [a] rate increase" and proposed an industry study for that purpose. (Pls.' Ex. 12, at 2.) According to the minutes of the meeting, TIRBOP objected that such a study was "totally irrelevant" to the merits of its filing, stated that it was unwilling to "leave [the] filing in limbo" during the course of the study, and requested that DOI instead approve the filing before the study was completed. (*Id.* at 2-4.) Doane noted that DOI had, in the past, "affirmatively approved filings as an accommodation to TIRBOP to shield them from anti-trust litig[ation]," but "today, [there is a] very different climate & they are asking us to do something we have no oblig[ation] to do under [the] statute." (*Id.* at 4.)

On July 2, 2009, TIRBOP withdrew the portion of its filing that sought changes to the rate structure and increased rates for policies with liability limits above $30 million. (PRDS ¶ 8; DS Ex. L.) The only remaining portion of the filing was TIRBOP's proposed price increase for the CSL. (DS Ex. L, at 2.) DOI stated that this proposed increase was necessary in order to offset the additional risks that insurers would assume under the new form CSL. (*Id.*) As noted above, these charges were not subject to agent commissions. DOI approved the remaining proposal on July 27, 2009, to become effective September 14, 2009. (PRDS ¶ 8; DS Ex. M.)

On August 20, 2009, DOI publicly announced that it would perform a study on the title insurance industry in cooperation with consultants from the Regulatory Research Corporation and Birny Birnbaum Consulting, Inc. (DS ¶¶ 22-23; DS Ex. O.)[6] DOI requested information from title insurers and underwriters about their agents, including title insurance agent commissions and the costs of agents' marketing activities. (DS ¶ 24; DS Ex. O, at 1.) DOI then used this information to develop a sample cross-section of title insurance agents from whom it directly requested further information regarding title agent activities and expenses. (PRDS ¶¶ 25-28.) Title agents were required to respond to DOI's information request by May 3, 2010. (DS Ex. P, at 4.) As a result, at the time that plaintiffs submitted their response to defendants' motion for summary judgment on April 22, 2010, the study had not been completed and DOI had not taken action on the basis of any information obtained through the study. (PRDS ¶ 22.) Nor, apparently, has TIRBOP submitted or resubmitted any further rate proposals.[7]

---

[6] The Regulatory Research Corporation is affiliated with Dr. Lipshutz. (DS Ex. O, at 1.)

[7] No party has submitted additional information to the court since that date concerning the study or any DOI actions.

**E.    Procedural History**

This suit began as a series of similar class actions, the first of which was filed on March 11, 2008. (PCS ¶ 16.) On August 20, 2008, the court ordered the consolidation of these suits, and the above plaintiffs then filed a consolidated class action complaint. On defendants' joint motion, I dismissed as barred by the filed rate doctrine those portions of the consolidated complaint that sought damages for defendants' past rate filings. *See In re Pa. Title Ins. Antitrust Litig.*, 648 F. Supp. 2d 663, 689 (E.D. Pa. 2009). Plaintiffs' only remaining claims are for injunctive relief ordering defendants to refrain from submitting additional collective rate filings "at supra-competitive prices, including the costs of kickbacks and inducements in determining rates and hiding these costs in submissions to the DOI." *Id.* at 689-90.

**II.    Standard of Review**

A motion for summary judgment must be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The moving party bears the initial burden of demonstrating that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met this initial burden, the nonmoving party must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting and adding emphasis to Fed. R. Civ. P. 56(e)). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 743 (3d Cir. 1996) (citation and internal quotation marks omitted). The non-movant must present concrete evidence supporting each essential element

of its claim. *Celotex*, 477 U.S. at 322-23.

In evaluating a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Ideal Dairy Farms*, 90 F.3d at 744 (citation and internal quotation marks omitted). However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990). The non-movant must show more than "[t]he mere existence of a scintilla of evidence" for elements on which he bears the burden of production. *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

State action is an affirmative defense to antitrust liability and defendants bear the burden of proving it applies. *Yaeger's Fuel, Inc. v. Pa. P&L Co.*, 22 F.3d 1260, 1266 (3d Cir. 1994). As a result, in order to prevail on summary judgment, defendants must show that they have "produced enough evidence to support the findings of fact necessary to win." *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 237 (3d Cir. 2007). "If the moving party successfully points to evidence of all of the facts needed to decide the case on the law short of trial, the non-moving party can defeat summary judgment if it nonetheless produces or points to evidence in the record that creates a genuine issue of material fact." *Id.* at 238. Plaintiffs cannot, however, "rest on mere pleadings or allegations" but "must point to actual evidence in the record on which a jury could decide an issue of fact [their] way." *Id.* "Put another way, it is inappropriate to grant summary judgment in favor of a moving party who bears the burden of proof at trial unless a reasonable juror . . . would be compelled to find its

way on the facts needed to rule in its favor on the law." *Id.* (internal footnote omitted).

## III.    Discussion

The state action doctrine has its roots in the Supreme Court's decision in *Parker v. Brown*, 317 U.S. 341 (1943), upholding California's state-supervised raisin marketing program against a challenge under the Sherman Act. The Court held that where the state, "as sovereign, impose[s] [a] restraint [on trade] as an act of government," it is immune from suit under the Sherman Act. *Id.* at 352.

The *Parker* decision was "premised on the assumption that Congress, in enacting the Sherman act, did not intend to compromise the States' ability to regulate their domestic commerce." *S. Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 56 (1985). Because "success of an antitrust action should depend upon the nature of the activity challenged, rather than on the identity of the defendant," *id.* at 58-59, the Court's reasoning in *Parker* also "extends to suits against private parties," *id.* at 56.

Private anticompetitive conduct is entitled to state action immunity only when (1) "the State has articulated a clear and affirmative policy to allow the anticompetitive conduct," and (2) "the State provides active supervision of anticompetitive conduct undertaken by private actors." *FTC v. Ticor Title Ins. Co. ("Ticor II")*, 504 U.S. 621, 631 (1992) (citing *California Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980)). Both elements of the *Midcal* test are "directed at insuring that particular anticompetitive mechanisms operate because of a deliberate and intended state policy." *Id.* at 636.

"[S]tate-action immunity is disfavored . . . ." *Id.* "[I]nsistence on real compliance with both parts of the *Midcal* test will serve to make clear that the State is responsible for the price fixing it has sanctioned and undertaken to control." *Id.* As noted above, defendants bear the burden of proving

both elements.

## A.  Pennsylvania has Clearly Articulated a State Policy to Allow Defendants' Collective Rate Filings

Pennsylvania's title insurance statute permitting title insurers to file proposed rates with DOI through licensed rating organizations such as TIRBOP constitutes a clearly articulated state policy in favor of collective rate-setting. Plaintiffs contend that Pennsylvania's statutory policy authorizing collective rate filings pertains only to concert of action among title insurance companies under the same general management and control and that the Insurers are not all under the same general management or control. I conclude, however, that Pennsylvania law authorizes insurers to join and submit rate filings through rating organizations even if those insurers are not all under common management and control.

"As long as the State as sovereign clearly intends to displace competition in a particular field with a regulatory structure, the first prong of the *Midcal* test is satisfied." *S. Motor Carriers*, 471 U.S. at 64. Moreover, "a state policy need not be aimed at restraining competition for a person acting pursuant to that policy to be immune from antitrust liability." *Yeager's Fuel*, 22 F.3d at 1266. Rather, it is "enough . . . if suppression of competition is the 'foreseeable result' of what the statute authorizes . . . ." *Omni*, 499 U.S. at 373 (quoting *Hallie*, 471 U.S. at 42).

Plaintiffs do not dispute that Pennsylvania has endeavored to replace competition in the title insurance industry at least in part with a regulatory structure. *See, e.g.*, 40 Pa. Stat. § 910-37 to -40 (requiring title insurers to file rate proposals with DOI and granting DOI the authority to review and disapprove rate proposals that are inadequate, discriminatory, or excessive). Plaintiffs argue, however, that the Insurers' collective rate-filing practices cannot be pursuant to state policy because Pennsylvania has a policy against collective rate filing by insurers not under the same general management and control. In support of their argument, plaintiffs rely on language in 40 Pa. Stat.

Ann. § 910-41(c), which provides that:

> Cooperation among rating organizations, or among rating organizations and title insurance companies, and concert of action among title insurance companies under the same general management and control in rate making or in other matters within the scope of [the Act] is hereby authorized, provided the filings resulting therefrom are subject to all the provisions of this article which are applicable to filings generally. The commissioner [of insurance] may review such activities and practices and if, after a hearing, he finds that any such activity or practice is unfair or unreasonable or otherwise inconsistent with the provisions of this article, he may issue a written order specifying in what respects such activity or practice is unfair or unreasonable or otherwise inconsistent with the provisions of this article and requiring the discontinuance of such activity or practice.

The first part of this subsection is amenable to two conflicting interpretations. Plaintiffs argue that this subsection authorizes "cooperation" generally among rating organizations and title insurance companies, but authorizes "concert of action" "in rate making or in other matters" only among title insurance companies under the same general management and control. Defendants contend that the statute authorizes "cooperation" in rate making or in other matters among rating organizations or among rating organizations and title insurance companies and authorizes "concert of action" in rate making and other matters among title insurance companies under the same management or control.[8] TIRBOP is a licensed rating organization under this statute. (*See* DS ¶ 72.)

Plaintiffs' reading is inconsistent with the Third Circuit's decision in *Ticor Title Ins. Co. v. FTC ("Ticor I")*, 922 F.2d 1122 (1991). In that decision, the Third Circuit held that Pennsylvania's Title Insurance Act clearly articulates a policy in favor of collective rate-setting by title insurers. 922

---

[8] It is unclear from the language of the statute whether and to what extent "cooperation" is conceptually distinct from "concert of action." The parties have not identified any case law or legislative history making such a distinction between these two concepts. The court notes that the Northern District of Ohio recently interpreted a similarly worded Ohio statute, which stated that "[c]o-operation among rating bureaus, or among rating bureaus and insurers, in rate making . . . is authorized," as authorizing collective rate filing through rating bureaus. *See In re Title Ins. Antitrust Cases*, ___ F. Supp. 2d ___, No. 1:08CV677, 2010 WL 1267129, at *29-30 (N.D. Ohio Mar. 31, 2010); Ohio Rev. Code § 3935.06.

F.2d at 1133-35.[9] Although plaintiffs argue that the Third Circuit's decision in *Ticor I* was reversed

by the United States Supreme Court, the relevant holding was not contested in that appeal and the

Supreme Court's decision addressed only the "active supervision" prong of the *Midcal* test, not the

"clearly articulated policy" prong. *See Ticor II*, 504 U.S. at 628, 631. As a result, *Ticor I* remains

good law as to the first prong of the *Midcal* test and its holding on that issue is binding on this

court.[10] *See also McIlhenny v. Am. Title Ins. Co.*, 418 F. Supp. 364, 371 (E.D. Pa. 1976) (citing 40

Pa. Stat. Ann. § 910-41(c) and noting that "cooperation and concert of action among title insurance

companies and rating organizations in rate making and other matters is specifically authorized by

statute").

Even if the Third Circuit had not already directly addressed this issue, I would nonetheless

conclude that Pennsylvania has a clearly articulated policy in favor of collective filing of title

insurance rates. "The federal antitrust laws do not forbid the States to adopt policies that permit, but

do not compel, anticompetitive conduct by *regulated* private parties." *S. Motor Carriers*, 471 U.S.

---

[9] The Third Circuit never limited its holding to cases in which all insurers are under the same general management and control. Indeed, it appears that the defendants in *Ticor I* were not under the same management or control. The defendants in *Ticor I* were Ticor Title Insurance Company, Chicago Title Insurance Company, SAFECO Title Insurance Company, Lawyers Title Insurance Corporation, and Stewart Title Guaranty Company. According to plaintiffs' consolidated complaint in this action, Ticor Title and Chicago Title are part of the Fidelity family of title insurance companies, Lawyers Title is part of the LandAmerica family of title insurance companies, and Stewart Title is part of the Stewart family of title insurance companies. (CC ¶¶ 11-18.)

[10] Plaintiffs also criticize *Ticor I* by arguing that it never addressed the impact of 40 Pa. Stat. Ann. § 910.41(c), discussed in further detail below. However, as defendants note, the Third Circuit in *Ticor I* considered the impact of the entire Title Insurance Act, of which § 910.41(c) is a part. The relevant statutory language has not changed in any significant way since the Third Circuit issued its decision in *Ticor I*. Moreover, the opinions of the Third Circuit are binding in this district regardless of the reasoning behind them. *See United States v. Extreme Assocs., Inc.*, 431 F.3d 150, 157-59 (3d Cir. 2005); *Richard Banks v. Gallagher*, 686 F. Supp. 2d 499 (M.D. Pa. 2009) (citing and discussing *Extreme Assocs.*).

at 60. "As long as the State clearly articulates its intent to adopt a permissive policy, the first prong of the *Midcal* test is satisfied." *Id.* As noted above, it is possible to read § 910-41(c) as permitting cooperation among rating organizations and title insurance companies in rate setting. Although the Pennsylvania Supreme Court has not addressed the issue, I conclude that it would most likely agree with this interpretation of § 910-41(c).

Although the policies of a regulatory agency, acting alone, cannot satisfy the first prong of the *Midcal* test, *see S. Motor Carriers*, 471 U.S. at 64, in Pennsylvania, "the construction of a statute by those charged with its execution and application is entitled to great weight and should not be disregarded or overturned except for cogent reasons, and unless it is clear that such construction is erroneous." *Spicer v. Pa. Dep't of Pub. Welfare*, 428 A.2d 1008, 1009 (Pa. Commw. Ct. 1981); *see also Ticor I*, 922 F.2d at 1134 (citing *Masland v. Bachman*, 374 A.2d 517, 522 (Pa. 1977)). The Act grants to DOI the task of accepting and reviewing rate filings. *See* 40 Pa. Stat. §§ 910-1(5) (defining "fees"), 910-37(a) (requiring insurance companies or private rating organizations to file with DOI a manual of fees). As a result, DOI's interpretation of the statute in this context is entitled to deference. *Ticor I*, 922 F.2d at 1134. As is evidenced by DOI's repeated acceptance of defendants' rate filings through TIRBOP, DOI interprets the Act as permitting joint rate filing through TIRBOP by insurance companies not under the same general management and control. Plaintiffs have not provided any explanation, beyond their conclusory allegation that the wording of the statute is clear, as to why the DOI's interpretation is unreasonable.

Indeed, the Act permits title insurers to satisfy their filing obligations by authorizing a rating organization to make filings on their behalf, *see* 40 Pa. Stat. Ann. § 910-37, and requires title insurance rating bureaus to "permit any title insurance company not a member to be a subscriber to its rating services," 40 Pa. Stat. Ann. § 910-41(b). These provisions appear to contemplate rate

filings through rating bureaus of open membership similar to the system in *Southern Motor Carriers*. *See* 471 U.S. at 51 (discussing the benefits of collective ratemaking to the efficient operation of supervising agencies). In such a context, it would be anomalous to read the Act as forbidding any two title insurers from filing rates through the same rating organization unless the insurers are under the same management or control. In interpreting Pennsylvania statutes, courts are to presume "[t]hat the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable." *See* 1 Pa. Cons. Stat. § 1922(1).[11]

## B.     TIRBOP's Rate Filings Are Actively Supervised by the State

Plaintiffs argue that DOI does not supervise title insurance rates effectively because it lacks the authority, resources, and expertise to determine the reasonableness of title agent commissions, which account for over 80% of those premiums. Plaintiffs further argue that, instead of actually evaluating the merits of TIRBOP's rate filings, DOI has engaged in "superficial [supervisory] activity" that "was, at best, window dressing designed to create an appearance of supervision, rather than to look inside the aptly-termed 'black box' [of agent commissions] that comprised over 82% of title insurance rates." (Pls.' Opp'n 6.) Although no evidence has been submitted that DOI has, prior to February of 2009, specifically investigated agent commissions, as opposed to title insurance rates in general, defendants have presented undisputed evidence showing that the regulatory climate has since changed and that DOI currently actively supervises rate filings, including the agent commissions component. Moreover, plaintiffs have failed to present evidence in rebuttal. Because

---

[11]Furthermore, it makes sense to me to read the authorizing statute to state that "cooperation . . . among rating organizations and title insurance companies . . . in rate making or in other matters within the scope of this article is hereby authorized." If the rate making language at the end did not apply to the cooperation language at the beginning, the cooperation language would be meaningless.

there is no genuine issue of material fact as to whether DOI currently actively supervises rate filings or whether there is an imminent threat that DOI will fail to actively supervise rate filings, I will grant summary judgment to defendants.

## 1. Standard for Active Supervision

State action immunity "is conferred out of respect for ongoing regulation by the State, not out of respect for the economics of [the challenged activity]." *Ticor II*, 504 U.S. at 633. As a result, "the purpose of the active supervision inquiry is not to determine whether the State has met some normative standard, such as efficiency, in its regulatory practice." *Id.* at 634. Rather, its purpose is to require the States to "accept political responsibility for actions they intend to undertake." *Id.* at 636.

Active supervision is necessary to ensure such political responsibility because, "where a private party is engaging in the anticompetitive activity [authorized by state policy], there is a real danger that he is acting to further his own interests, rather than the governmental interests of the State." *Patrick*, 486 U.S. at 100. As a result, "[a]ctual state involvement, not deference to private [anticompetitive activity] under the general auspices of state law, is the precondition" for immunity from antitrust laws. *Ticor II*, 504 U.S. at 633. The operative inquiry is "whether the State has exercised sufficient independent judgment and control so that the details of the rates or prices have been established as a product of deliberate state intervention, not simply by agreement among private parties." The state must play a "substantial role in determining the specifics of economic policy." *Ticor II*, 504 U.S. at 634-35. "This supervision requirement prevents the State from frustrating the national policy in favor of competition by casting a 'gauzy cloak of state involvement' over what is essentially private anticompetitive conduct." *S. Motor Carriers*, 471 U.S. at 57 (quoting *Midcal*, 445 U.S. at 106). The only private anticompetitive activity entitled to immunity will be those "that, in

the judgment of the State, actually further state regulatory policies." *Patrick*, 486 U.S. at 100-01. A state may not simply "give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." *Parker*, 317 U.S. at 351.

In the context of collective rate filings, the question for active supervision is governed by the *Ticor* line of cases. In that action, the FTC sued numerous title insurance companies under the FTC Act, 15 U.S.C. § 45(a)(1), alleging that the companies had unlawfully conspired to set title search and examination rates by filing them collectively with the insurance departments of various states. By the time the matter reached the Third Circuit for the first time, active supervision was only disputed as to four states: Arizona, Connecticut, Montana, and Wisconsin. In *Ticor I*, the Third Circuit held that all four state insurance departments actively supervised the rate filings by "demonstrat[ing] some basic level of activity directed towards seeing that private actors carried out the state's policy and not simply their own policy," such as reviewing filings, seeking some additional information from the insurers to justify the proposed rates, and meeting on one occasion with industry representatives regarding a filing. 922 F.2d at 1137-40 (quoting *New England Motor Rate Bureau, Inc. v. FTC*, 908 F.2d 1064, 1071 (1st Cir. 1990)).

The Supreme Court reversed. *See Ticor II*, 504 U.S. at 640. Applying the state action doctrine in the same manner as if it were reviewing a Sherman Act challenge, *id.* at 635, the Court held that, in order for state action immunity to apply, state regulatory bodies must not only demonstrate some "basic level of activity" directed towards supervising the private anticompetitive conduct but also "show that state officials have undertaken the necessary steps to determine the specifics of the price-fixing or ratesetting scheme," *id.* at 638. In particular, in order to engage in active supervision state officials must "have and exercise power to review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy." *Id.* at 634. "The question is not how well

state regulation works but whether the anticompetitive scheme is the State's own." *Id.* at 635. The Supreme Court stated that this standard was designed to "make clear that the State is [politically] responsible for the price fixing it has sanctioned and undertaken to control." *Id.* at 636.

Applying its standard to the Administrative Law Judge's factual findings regarding Montana's and Wisconsin's regulatory supervision of title insurance rate filings, the Court concluded that the "potential for state supervision [in those states] was not realized in fact." *Id.* at 638. In both states, "at most the rate filings were checked for mathematical accuracy" and "[s]ome were unchecked altogether." *Id.* Although the state agencies at times requested additional information from the private rating bureaus, the Montana agency allowed a rate filing to become effective "despite the failure of the rating bureau to provide additional requested information" and the Wisconsin agency permitted one rate filing to remain in effect for seven years before the rating bureau finally provided the requested additional information. *Id.*

On remand, applying the new standard, the Third Circuit reached a similar conclusion with regard to state supervision of title insurance rate filings in Arizona and Connecticut. *Ticor Title Ins. Co. v. FTC ("Ticor III")*, 998 F.2d 1129, 1138-41 (3d Cir. 1993). With respect to Arizona, the Third Circuit noted that, according to the findings of the administrative law judge, the Insurance Department "'conducted no examination of the Arizona Rating Bureau although there is a statutory requirement for such an examination at least once every five years.'" 998 F.2d at 1139 (quoting *In re Ticor Title Ins. Co.*, FTC Docket No. 9190, 1986 WL 293180 (Dec. 22, 1986)). In addition, "Arizona law did not require that insurance rate filings be subjected to public notice, comment and hearings, nor did it require that a written decision, reviewable by the state courts, be issued for each rate filing." *Id.* "[N]o public hearing was ever held" on the rate filings, "[n]o rate filing was ever disapproved." *Id.* Instead, "filed rates were deemed approved if the director took no action on them

within fifteen days of their filing." *Id.* Although the Arizona Insurance Department did inquire into one rate filing before letting it take effect, "in reality the Insurance Department approved the filing without undertaking any substantive review" as there was "no convincing evidence that either the Rating Bureau justified the rate increase or the State reviewed it." *Id.*

As to Connecticut, the Third Circuit noted that, although the Insurance Department had the authority to "conduct audits and hold hearings on rates set by the [Rating] Bureau," it "did not do either." *Id.* at 1140. Like Arizona, the Connecticut Department of Insurance had a "file and use" approach under which, if the Insurance Commissioner did not disapprove proposed rates within thirty days, they were "deemed approved and became effective." *Id.* Although the Connecticut Insurance Department asked for additional justification on one occasion when the rating bureau proposed a rate increase, there was "no evidence in the record that the additional justification . . . was satisfactorily provided before approval." *Id.* On the other occasion when the bureau requested a rate increase, a state insurance official met with the bureau and discussed the filing but "did not have authority to act with respect to the cost data that were, in his opinion, excessive." *Id.* As a result, Connecticut "could not meaningfully examine the rates proposed because it never obtained the information necessary for a proper evaluation." *Id.*

## 2.     DOI Has the Authority to Review the Insurers' Filings Through TIRBOP.

Although plaintiffs suggest that DOI lacks the authority to regulate agent commissions, the Act clearly confers such authority on DOI. Title insurers are required to file with DOI "every manual of classifications, rules, plans, and schedules of fees and every modification of any of the foregoing relating to the rates which it proposes to use." *See* 40 Pa. Stat. Ann. § 910-37(a). DOI must then review the rates to ensure that they are not "inadequate," "unfairly discriminatory," or "excessive." *Id.* § 910-39(b). DOI is required to reject any filings that do not meet these requirements. *Id.* § 910-

40(a); "In making rates, due consideration shall be given to . . . past and prospective expenses, *including commissions paid to agents . . . .*" *Id.* § 910-39(a) (emphasis added). DOI therefore has the authority to consider agent commissions in determining whether title insurance rates are inadequate or excessive. *Cf. Ticor I*, 922 F.2d at 1134 (citing § 910-40(a) and holding that DOI has the authority to regulate commissions paid to attorney-agents for title search and examination services).

**3.      DOI Currently Actively Supervises Rate Filings.**

Plaintiffs argue that, even if in theory DOI enjoys the authority to regulate title agent commissions, in practice it does not. However, plaintiffs concede that in the past over a period of years the DOI has refused to approve filings or required modifications before approval. (PRDS §§ 4, 18-19, 34, 45-49, 51-56). DOI has also obtained reductions on previously approved rates *id.* §§ 35-37 and requested and  received comments from the public on proposed rates.  *Id.* §§ 6, 10, 11. Finally, the Department has held public hearings on rate related matters *id.* §§ 6, 20, 21 and required and reviewed annual reports.  *Id.* §§ 6, 66-70. All of these actions, conceded by the plaintiffs, are indicia of active supervision.

Plaintiffs respond, in particular, (1) that DOI has failed to obtain sufficient information to conduct an effective review of agent commissions costs, (2) that DOI lacks the expertise to evaluate agent commissions costs, and (3) that DOI's recent investigative activity was "designed more to make a showing of activity than to actually supervise" the rate filing. (Pls.' Opp'n 12.)

The court concludes, however, that the defendants have identified adequate undisputed evidence that particularly beginning with TIRBOP's February 2009 rate filing and continuing until the present, DOI has actively supervised the agent commissions component of title insurance rates. Despite TIRBOP's persistent lobbying of DOI to approve its rate filings solely on the basis of profit and loss before conducting a review of agent commissions, DOI insisted on conducting a hearing

and, later, a study on agent commissions. Although DOI had previously been willing to cooperate with TIRBOP in the past by approving its filings—an act that itself would not necessarily show an absence of active supervision—DOI declined to do so with respect to most aspects of TIRBOP's latest filing, citing a changed "climate" for insurance regulation. Plaintiffs have not presented any evidence that DOI does not plan on actually reviewing and acting on the results of its study, which was still in progress at the close of briefing for this motion and has not been supplemented thereafter. Moreover, even if there were a "sham" exception to the state action doctrine, plaintiffs have presented no evidence from which a reasonable juror could conclude that DOI has acted in bad faith. As a result, I conclude as a matter of law that defendants are entitled to state action immunity for their allegedly anticompetitive activities.

In *Ticor II* and *Ticor III*, the Supreme Court and Third Circuit held that state agencies failed to exercise adequate supervision of private ratesetting agreements when they had failed to review, or to obtain information necessary to review, the merits of the rate filings before allowing the rates to go into effect, and had foregone public notice and comment procedures during review of the rate filings. Plaintiffs argue that DOI has similarly fallen short of the *Ticor* standard because it "has never, and lacks the ability to, evaluate the 'black box' of agency commissions." (Pls.' Opp'n 11.) Plaintiffs do not dispute, however, that in 2009 DOI held a public information hearing on agent commissions and, subsequent to the hearing, initiated a study to collect more data on agent commissions. Instead, plaintiffs focus on remarks by the Commissioner of Insurance at that hearing that DOI had, *until then*, never investigated the composition of agent commissions and that DOI did not at that time have the data to do so. (*See* Pls.' Opp'n 10-11; Pls.' Ex. 2, at 88 (testimony of Commissioner Ario, noting that "we don't have a lot of this cost data" regarding agent commissions and "we're going to have a hard time getting that and nobody's trying to figure out how to get into

this particular black box effectively").) Those statements occurred at the outset, not the conclusion, of DOI's investigation into these costs. Although it appears that DOI's investigative efforts are still ongoing,[12] it is undisputed that, since February of 2009, DOI has declined to approve any proposed changes to rates that would be subject to title agent commissions until after the completion of the study and that, as a result, no such changes have gone into effect.

Commissioner Ario's remarks may be relevant to the question of whether DOI's investigation was effective with regard to TIRBOP's filings before the February 2009 filing. However, any past failure by DOI to collect information on agent commissions is of only limited relevance. Plaintiffs are now seeking solely injunctive relief. Such relief is only available to protect against "threatened loss or damage," 15 U.S.C. § 26, and plaintiff must show a "significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130 (1969). "'Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.'" *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 14 (1st Cir. 2008) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (U.S. 1974)). Plaintiffs have not presented any material evidence that the present DOI study is actually unlikely, when completed, to provide the necessary information.[13] Moreover,

_____

[12] Title insurance agents' responses to the DOI's data call were due on May 3, 2010, which was after the plaintiffs submitted their response. (DS ¶ 30.) Although defendants submitted their reply on May 24, 2010, they have not informed the court as to whether the study was complete as of that time.

[13] Although a witness at the May 28, 2009, hearing stated that collecting such information would be a "daunting" task, he proceeded to state that it was possible. (Pls.' Ex. 2, at 34) Moreover, although one witness stated that DOI may not have the financial resources to conduct such an investigation, that witness was testifying as the director of the National Association of Insurance Commissioners and did not claim to have any personal knowledge of DOI's finances. (*See* Pls.' Ex. 2, at 34-35 (testimony of Eric Nordman ).) According to DOI's announcement of

plaintiffs have not presented evidence that DOI is likely to abandon its current investigative efforts in the imminent future, nor have they explained how DOI's behavior with regard to filings before February 2009 is a better indicator of its future behavior than its behavior within the past year.

Plaintiffs further argue that, even if DOI is successful in gathering all of the necessary information to evaluate agent commissions, it lacks the expertise to do so. The only evidence plaintiffs present concerning this lack of expertise are comments by Commissioner Ario during the May 28, 2009, hearing. (*See, e.g.*, Pls.' Ex. 2, at 66 (describing agency commissions as a "complicated black box" and stating that DOI did not "have a lot of experience at looking inside that"), 122 (noting that "it's probably not even within our expertise to get into" regulating agent commissions), 34 ("[t]ypically we don't look at [agent commissions] in insurance regulation").) However, "the purpose of the active supervision inquiry is not to determine whether the State has met some normative standard, such as efficiency, in its regulatory practices," but rather whether the state has "played a substantial role in determining the specifics of the economic policy." *Ticor II*, 504 U.S. at 634-35; *see also id.* at 635 ("The question is not how well state regulation works but whether the anticompetitive scheme is the State's own.") As a result, any doubts that the DOI may have had about whether it has "expertise" in regulating title agent commissions are irrelevant so long as the DOI actually endeavors to regulate them. As noted above, the undisputed evidence shows that the DOI acted on its concerns regarding its own expertise by asking repeatedly for input on how to evaluate agent commissions from academics and professionals who attended the May 28, 2009,

---

the study, the study is in fact funded by TIRBOP, not DOI. (*See* DS Ex. O, at 1.) Moreover, defendants have presented evidence showing that, with the help of two independent consultants, DOI has actually contacted title insurance agents throughout Pennsylvania requesting detailed financial information. No reasonable juror could, on the basis of limited hearing testimony that occurred before the DOI launched its study, conclude that the study was unlikely to succeed at gathering relevant information.

hearing and by hiring two consulting firms to conduct a study on agent commissions.[14]

Plaintiffs finally argue that DOI's activity in investigating the agent commissions component of TIRBOP's rate proposal was not actually "independent" but rather a collusive effort with TIRBOP intended merely to create the appearance of active supervision for the purposes of immunizing TIRBOP from antitrust liability. Not only are DOI's subjective motivations irrelevant to the active supervision inquiry but also plaintiffs have not presented more than a scintilla of evidence to show that DOI's alleged lack of investigation of agent commissions creates a "genuine issue of material fact."

Plaintiffs have not cited any cases in which an agency's collaboration with private actors and intent to shield private actors from antitrust liability were considered factors weighing against a finding of active supervision. In the context of state action immunity, inquiry into the subjective motivations of state regulatory bodies is disfavored. In *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365 (1991), the Supreme Court rejected a proposed exception to the state immunity doctrine that would have denied immunity when government employees conspired with private actors. "Since it is both inevitable and desirable that public officials often agree to do what

---

[14] Plaintiffs also mention in their counterstatement of facts that on December 13, 2007, Deputy Insurance Commissioner Randy Rohrbaugh stated to representatives from PLTA and ALTA that DOI needed to be "educated about title insurance." (PCS ¶ 15.) On March 28, 2008, soon after the first complaint in this action was filed, Pam Croke of the PLTA sent an email to other industry members stating that she had "followed up" on Commissioner Rohrbaugh's request and set up a "training session" on title insurance. (PCS ¶ 17.) Plaintiffs did not mention these facts in their brief in opposition to summary judgment. To the extent that plaintiffs intended to rely on these facts in support of their contention that DOI had insufficient expertise in title insurance to supervise rates actively, they fail to raise a genuine issue of material fact. At no point did the Deputy Commissioner state or imply that DOI was unable to perform its regulatory functions as a result of its need for education. In any case, in the intervening two and a half years since the Deputy Commissioner's statement, DOI has received considerable information about the title insurance industry via TIRBOP's filings and responses to DOI's requests for information, the Attorney General's commentary, and oral and written testimony from over 20 witnesses at the May 28, 2009, hearing.

one or another group of private citizens urges upon them," a "conspiracy" exception "would virtually swallow up" the state action doctrine." *Id.* at 375. As a result, "'[w]here the action complained of . . . was that of the State itself, the action is exempt from antitrust liability regardless of the State's motives in taking the action.'" *Id.* at 377-78 (quoting *Hoover v. Ronwin*, 466 U.S. 558, 579-580 (1984)) (second alteration in original); *see also Sandy River Nursing Care v. Aetna Cas.*, 985 F.2d 1138, 1144 (1st Cir. 1993) (citing *Omni* and noting that state action immunity is available even if "government employees were involved as conspirators with private actors in the challenged restraint of trade" and that legislators' motivation is an "off-limits issue"). As the Supreme Court explained in *Ticor II*, "the purpose of the active supervision inquiry is not to determine whether the State has met some normative standard, such as efficiency, in its regulatory practices." 504 U.S. at 643. The Sherman Act does not give federal courts the authority to review state regulatory agencies' credentials in order to determine whether they have sufficient political independence, resources, or expertise to craft desirable regulations.

Even assuming that state action immunity is unavailable in circumstances where the agency's supervisory efforts are a mere sham or are tainted by improper involvement with private industry actors, no reasonable juror could conclude that such circumstances are present in this case. In support of their argument that DOI colluded with TIRBOP in order to help defendants evade antitrust liability, plaintiffs cite handwritten notes from a June 8, 2009, meeting stating that the DOI has, in the past, "affirmatively approved" TIRBOP filings as an accommodation to "shield them from antitrust litigation." (Pls.' Ex. 12.) However, those notes, viewed in context, actually contradict plaintiffs' contention that DOI failed to act independently. At that meeting, DOI informed TIRBOP that agent commissions gave it "pause" and that it wanted a "better handle on costs / rev[erse] competition" in order to "better address those issues before considering [the] need for [a] rate

increase." (*Id.* at 1-2 (emphasis in original).) When TIRBOP's counsel objected that agent costs were "totally irrelev[ant] to [the] current filing" and requested that DOI approve its rate filing prior to the completion of the study (*id.* at 4), DOI explained that, although it has "affirmatively approved filing as an accommodation to TIRBOP to shield them from anti-trust litig[ation], today, [there is a] very different climate" and that TIRBOP was asking DOI "to do something [it had] no oblig[ation] to do under [the] statute." (*Id.*) It is undisputed that, following that meeting, DOI did not approve any part of TIRBOP's rate filing involving rates that were subject to agent commissions. Instead, TIRBOP withdrew those portions of its filing in order to avoid allowing them to "deem" into effect without the explicit approval of DOI. No reasonable juror could find, on the basis of these notes, that DOI somehow abandoned its duty to review TIRBOP's rate filings. Rather, the notes show that DOI resisted TIRBOP's efforts to persuade it to approve the rate filing without conducting a cost study that, in DOI's opinion, was necessary in order to conduct an adequate review of the filing.[15]

Plaintiffs also make much of the meetings between DOI and representatives of TIRBOP to discuss the filing and to discuss the anticipated testimony of various industry representatives at the May 28, 2009, hearing. Plaintiffs allege that the hearing was "not an example of 'active supervision' as urged by Defendants, but, rather, a well-rehearsed show by Defendants and the DOI to create an appearance of meaningful activity." (Pls.' Opp'n 13.) In support of this argument, plaintiffs rely entirely on the minutes of two meetings in which DOI and TIRBOP discussed the anticipated

---

[15] Plaintiffs' theory is further undermined by the Supreme Court's decision in *Ticor II*, in which the Court reasoned that the active supervision prong of the *Midcal* test should be strictly applied in order to "make clear that the State is responsible for the price fixing it has sanctioned and undertaken to control" and avoid a result in which "essential national policies are displaced by state regulations intended to achieve more limited ends." 504 U.S. at 636. If anything, such reasoning suggests that, even if DOI expressed an intention to shield TIRBOP from antitrust immunity with respect to specific rate filings, that expressed intention should weigh in favor of, not against, a finding of active supervision.

testimony of various industry representatives at the hearing and noted that TIRBOP would let DOI know which questions it would like DOI to ask of its critics. As noted above, however, most of the witnesses who testified at the hearing were never mentioned during the planning meetings. There is no indication that TIRBOP ever attempted to restrict the presence or testimony of witnesses critical of the filing. Moreover, although DOI mentioned that it "want[ed] input" from TIRBOP on questions to ask their critics, there is no evidence that any such input was binding on DOI or that TIRBOP attempted to prevent DOI from asking questions that would be detrimental to TIRBOP. DOI's request for input must be viewed in light of the fact that the hearing itself was not adversarial and, as a result, TIRBOP had no ability to "cross-examine" unfavorable witnesses on its own. (*See* Pls.' Ex. 8.)[16]

Even if, viewed alone, these minutes could support a reasonable inference that TIRBOP exercised undue control over the content of the hearing (which they do not), such an inference would necessarily be negated by the transcript of the hearing itself, which involved the testimony of numerous witnesses who opposed TIRBOP's rate filings and who were never mentioned in the minutes of the meetings between DOI and TIRBOP. (*See* Pls.' Ex. 2, at 109-17 (testimony of Professor Joseph Eaton, arguing that title insurance rates in Pennsylvania are too high); *id.* at 3-5 (Index of Witnesses).) Indeed, Commissioner Joel Ario explicitly agreed with the testimony of some

---

[16] Although plaintiffs also suggest that the hearing's focus on broader policy issues, rather than on the rate filing itself, is the result of TIRBOP's improper influence over the hearing, there is no evidence that this decision was anything other than the DOI's alone. TIRBOP's representatives repeatedly objected that the OAG's objections, which were the focus of the hearing (*see* Pls.' Ex. 8, at 1; Pls.' Ex. 9, at 1; Pls.' Ex. 12, at 2-4), were irrelevant to the pending rate filing and that DOI should make a decision on the rate filing before it held a hearing on those issues (*see* Pls.' Ex. 13, at 10 (response to OAG's objections); Pls.' Ex. 8, at 1). As a result, no reasonable juror could consider the subject matter of the hearing to be the result of TIRBOP's undue influence over DOI. Moreover, in its meetings with TIRBOP, DOI explicitly stated that, although the hearing would not be an "adversarial hearing to disapprove [the] filing at this point," "everything is on the table." (Pls.' Ex. 8, at 1.)

of the witnesses who opposed the rate filing. (*See id.* at 63 (stating, in response to the testimony of Jim Donahue from OAG recommending that DOI perform a study on title agent commissions, "I do think you're right . . . you can't fully analyze the rate request unless you think you have the data to do it.").) Moreover, after the hearing, DOI followed Donahue's recommendations by launching a study on agent commissions and declining to approve TIRBOP's rate filing (with the exception of the CSL fee, which was not included in the base used for calculating title agent commissions) until after the study was complete.[17]

Similarly, although plaintiffs contend that the hearing did not address the specifics of TIRBOP's rate filing, it is evident from the record that DOI's choice not to address the specifics of the rate filing was based on the fact that the objections it received from OAG were themselves not directed at the specifics of the rate filing but rather at the structure of title insurance pricing, especially agent commissions. Since those commissions form the very concern underlying plaintiffs' complaint, it is difficult to understand why plaintiffs view the scope of the hearing as problematic. According to plaintiffs' own account of the facts, DOI viewed OAG's objections as sufficiently significant that it considered itself unable to approve the pending rate filing without holding a hearing to address them. Even after the hearing, DOI declined to approve TIRBOP's rate filing and instead chose to begin an industry-wide study on title agent commissions in order to obtain more detailed data, despite TIRBOP's objections that such a study was irrelevant to the merits of its filing.

---

[17] Similarly, plaintiffs have failed to explain the relevance of a DOI representative's instruction to TIRBOP to be "circumspect" and not mention the details of their meeting to the OAG when TIRBOP met with the OAG in an attempt to persuade it to withdraw its objections. (*See* Pls.' Ex. 8, at 2.) Even if a reasonable juror could infer from this instruction an intent on the part of DOI to exert improper influence over the OAG, it is undisputed that the OAG in fact did not withdraw its objections and instead continued to oppose TIRBOP's rate filing. Because the OAG did not withdraw its objections, DOI proceeded with the hearing and, after the hearing, adopted the OAG's recommendations to conduct a study on agent commissions before approving any basic rate increases.

No part of the *Ticor* cases suggests that, in order to show active supervision, the agency must conduct its investigation all at once rather than in several steps, beginning with a review of the fundamental market principles underlying a filing and culminating in a review of the specific details. *See Yeager's Fuel v. Penn. Power & Light*, 22 F.3d 1260, 1271 (3d Cir. 1994) (holding that a state agency actively supervised rate filings when it "actually considered complaints" about the rate, made a decision on those complaints, and "affirmatively approved" the rate only "after considered study which included more than a review for mathematical accuracy.")[18] There is therefore no factual support for plaintiffs' suggestion that the hearing was a mere "sham" not intended to elicit testimony useful to TIRBOP.

Plaintiffs further argue that DOI lacked the authority to look into the costs underlying TIRBOP's rate filings as a result of a 1998 stipulation that a pre-tax profit margin of 5% of gross title revenue was "appropriate for the making of title insurance rates" and would "not produce rates which are inadequate or excessive." (PCS ¶¶ 1-4; Pls.' Ex. 1, at 3.) Plaintiffs argue that, through this stipulation, the DOI "effectively agreed to approve proposed title insurance rates, irrespective of the nature and merits of title insurance costs, so long as those rates produce a profit margin of 5% after subtracting those costs," and suggest that, as a result, DOI could not have intended to act on any information it gathered through the hearing and study. (PCS ¶ 5.) Plaintiffs' interpretation of that stipulation is contradicted by the undisputed fact that DOI repeatedly has pushed back on proposed rate changes based on considerations other than deviation from the stipulated 5% profit margin. For example, DOI refused to approve the portion of TIRBOP's 2009 rate filing that were intended to

---

[18] Defendants also cite *Sandy River Nursing Care v. Aetna Cas.*, 985 F.2d 1138, 1147 (1st Cir. 1993), in which the First Circuit stated that an insurance commissioner's "involvement in reviewing and modifying the insurers' proposed rates unquestionably meets [prong two of *Midcal*'s] requirement of active state supervision." In that case, however, the plaintiffs had conceded the issue of active supervision. *Id.*

simplify the basic rate structure, despite TIRBOP's assurances that this simplification was "revenue-neutral," that is, would not increase or decrease the Insurers' profit margins. (*See* Pls.' Ex. 12, at 4.) Moreover, at numerous meetings in 2009, TIRBOP urged DOI to approve its rate increase, arguing that OAG's objections were irrelevant to the merits of TIRBOP's filing because OAG did not question TIRBOP's data on the revenue it required to earn a 5% profit margin. (*See* Pls.' Ex. 8, at 1; Pls.' Ex. 9, at 1; Pls.' Ex. 12, at 2-4.) In response to DOI's refusal to do so, TIRBOP withdrew that portion of its filing and the structure of the rates was not changed. (See DS Ex. L.)

Similarly, in 2005, TIRBOP proposed additional fees for electronic recording of documents affecting title, and DOI requested further information about the costs and savings associated with electronic recording. (PRDS ¶¶ 44-45.) TIRBOP withdrew its proposal without providing the requested information. (PRDS ¶ 45.)[19] In 2006, TIRBOP proposed to introduce six new types of optional endorsements on title insurance policies and proposed rates to be charged for those endorsements. (DS ¶ 38.) DOI affirmatively approved these rates, but only after requesting further information on TIRBOP's choice to offer these services separately instead of as part of the basic insurance package and on the cost of offering these services. (*Id.* ¶¶ 39-41.) Again, DOI's inquiry was not limited to the question of profit margins. (*See* DS Exs. Y, Z.)

As a result, a reasonable juror could not conclude that DOI had surrendered the authority to review TIRBOP's rate filings in light of considerations other than the profit margin that they would

---

[19] Plaintiffs allege that DOI did not exercise any independent judgment or control in requesting this cost information, but they do not dispute that DOI requested the information, that TIRBOP withdrew its rate proposal in response to the request, and that, as a result, the proposed rates did not go into effect. Plaintiffs themselves suggest that TIRBOP's motivation in withdrawing the proposal was to avoid disclosure of information that would show that the added fees were inappropriate. (PRDS ¶ 45.) Thus, unlike the agencies in *Ticor II* and *Ticor III*, there is therefore no reason to infer from this series of events that DOI was indifferent about the cost information it requested or that it would have permitted the filing to go into effect without receiving such information.

produce. In making rates, the DOI is required to give "due consideration" to a number of factors, including "past and prospective loss experience," "exposure to loss," "underwriting practice and judgment," "past and prospective expenses, including commissions paid to agents," and "a reasonable margin for profit and contingencies." 40 Pa. Stat. Ann. § 910-39(a). The 1998 stipulation simply defines one of these factors, a "reasonable margin for profit and contingencies," to be a 5% pre-tax margin, without constraining the DOI's authority to review filings in light of the other relevant factors.

Because plaintiffs have failed to raise a genuine issue of material fact as to whether DOI actively supervises TIRBOP's rate filings, I conclude, as a matter of law, that defendants are entitled to state action immunity for their collective rate filings through TIRBOP.

## IV.    Conclusion

Because defendants are entitled to state action immunity as a matter of law, I will grant their motion for summary judgment and enter judgment for the defendants. Because my resolution of the state action issue is dispositive of plaintiffs' claims, I decline to reach the question of whether defendants' activities are also shielded from antitrust liability pursuant to the McCarran-Ferguson Act. An appropriate order follows.